650 A.2d 420

COMMONWEALTH of Pennsylvania, Appellee,

v.

Antoine Clayton WILLIAMS, Appellant.

Supreme Court of Pennsylvania.

Argued Jan. 25, 1994.

Decided Nov. 18, 1994.

64

W. Michael Trant, Chief Public Defender, Reading, for A. Williams.

Mark C. Baldwin, Dist. Atty., Iva C. Dougherty, Reading, for Com.

Robert A. Graci, Deputy Atty. Gen., Harrisburg, for Atty. Gen.

Before NIX, C.J., and FLAHERTY, ZAPPALA, PAPADAKOS, CAPPY, CASTILLE and MONTEMURO, JJ.

## OPINION OF THE COURT

PAPADAKOS, Justice.

We are presently required to review the conviction of murder of the first degree and the death sentence of Antoine

Clayton Williams (Appellant) pursuant to 42 Pa.C.S. § 9711(h)(1).[1] Appellant was arrested and charged with murder of the first degree,[2] for the death of twenty-three year old Jacqueline Lugo, who was beaten and stabbed to death in the front seat of a garbage truck in the City of Reading, Berks County on September 17, 1989.

Appellant was tried in the Court of Common Pleas of Berks County, before a jury with the Honorable Calvin E. Smith, presiding. On January 23, 1991, the jury returned its verdicts of guilty of murder of the first degree, aggravated assault (serious bodily injury),[3] aggravated assault (deadly weapon),[4] criminal attempt (to commit rape),[5] indecent assault,[6] and possessing instruments of a crime.[7] A separate sentencing hearing was held where the same jury was asked to consider aggravating and mitigating circumstances related to the victim's death and Appellant's character. Following this sentencing hearing, the jury determined that three aggravating circumstances were present, namely, 1) that Appellant committed the killing while in the perpetration of a felony;[8] 2) that the offense was committed by means of torture;[9] and that 3) Appellant has a significant history of felony convictions involving the use or threat of violence to the person.[10] The jury also considered as relevant, evidence of mitigation concerning the

1. 42 Pa.C.S. § 9711(h) provides:
 (h) Review of death sentence.—
 (1) A sentence of death shall be subject to automatic review by the Supreme Court pursuant to its rules.

2. The Crimes Code defines murder of the first degree as:
 "[a] criminal homicide ... committed by an intentional," i.e., "willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(a), (d).

3. 18 Pa.C.S. § 2702(a)(1).
4. 18 Pa.C.S. § 2702(a)(4).
5. 18 Pa.C.S. § 901(a).
6. 18 Pa.C.S. § 3126(a)(1).
7. 18 Pa.C.S. § 907(a).
8. 42 Pa.C.S. § 9711(d)(6).
9. 42 Pa.C.S. § 9711(d)(8).
10. 42 Pa.C.S. § 9711(d)(9).

character and record of Appellant and the circumstances of this killing and found this as a mitigating factor,[11] but concluded that the aggravating circumstances present outweighed the mitigating factor and determined that Appellant be sentenced to death. Post-verdict motions were argued and denied, and the trial court sentenced Appellant to death on February 1, 1991 on the murder of the first degree conviction and to a consecutive term of 5–10 years imprisonment on the attempted rape conviction to be followed by a consecutive term of 1–5 years imprisonment on the possession of an instrument of crimes charge. The trial court also ruled that the aggravated assault convictions merged for sentencing purposes into the murder of the first degree conviction as lesser included offenses and that the indecent assault conviction merged for sentencing purposes into the attempted rape conviction as a lesser included offense. This automatic appeal followed.

■■■ As is our practice in death penalty cases, we begin our review of this matter by a discussion of whether the evidence submitted at trial was sufficient to support the verdict of murder of the first degree as returned by the jury. See *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). The standard we apply in reviewing the sufficiency of evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the jury to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Reid*, 533 Pa. 508, 626 A.2d 118 (1993); *Commonwealth v. Rolan*, 520 Pa. 1, 549 A.2d 553 (1988); *Commonwealth v. Holcomb*, 508 Pa. 425, 498 A.2d 833 (1985). This standard is equally applicable to cases where the evidence is circumstantial rather than direct so long as the combination of the evidence links the accused to the crime beyond a reasonable doubt. *Commonwealth v. Hardcastle*, 519 Pa. 236, 546 A.2d 1101 (1988), *cert. denied*, 493 U.S. 1093, 110 S.Ct. 1169, 107 L.Ed.2d 1072 (1990); *Commonwealth v. Sullivan*, 472 Pa. 129, 371 A.2d 468 (1977).

11. 42 Pa.C.S. § 9711(e)(8).

■ The evidence presented at trial, together with all reasonable inferences in favor of the Commonwealth, discloses the following. On Sunday morning, September 17, 1989, at approximately 2:55 a.m., Reading police officers were summoned to the 400 block of Gilson Alley in Reading, Pennsylvania, to investigate a report of an injured woman. Upon their arrival, Officer Hafner was met by Appellant and his father, Albert Norman. They took Officer Hafner to a place in the alley where a partially clothed woman was lying facedown next to two garbage trucks owned by Appellant's father. The officer saw a substantial amount of blood in the cab of one of the garbage trucks and a trail of blood could be detected from the truck to the body. Blood was also found on the doorway of the cab and in the seat area. The victim, twenty-three year old Jacqueline Lugo, was found with her panties pulled down around her thighs, her shirt pulled up under her arms and her bra ripped in the front. Both her eyes had been beaten closed and she had sustained at least five other blows to the face. Her neck showed signs of being choked and a stab wound to her neck pierced through to her throat and tongue. Numerous stab wounds were found on her torso and dirt and stones were found inside her panties.

Dr. Neil A. Hoffman, a forensic pathologist, who was also at the crime scene, observed the body and later determined that the cause of death was a stab wound through the heart. Similar stab wounds were detected on the left side of the victim's neck, in the middle of her chest and in her abdomen near her navel and police eventually retrieved a broken knife blade and another knife from the crime area which could have easily made the types of stab wounds observed on the victim's body.

Officer Albert D. Shade, Jr., who was dispatched to the crime scene with Officer Hafner, also found a yellow shirt stained with blood in a wooded area near the body. This shirt was later identified as having been worn by Appellant on the day of the murder and another witness was able to testify that Appellant was wearing the shirt just prior to the murder. When the officers arrived at Gilson Alley, Appellant was

wearing a jacket without a shirt and his hands and forehead were covered in blood as was the inside of his jacket. Blood was also found on the inside of Appellant's waistband and underwear, suggesting that they got stained with blood when Appellant's pant's zipper was open and his pants were down.

There was evidence that yellow fibers were found in the victim's bra and panties and that these fibers originated from the bloody yellow shirt worn by Appellant on the night of the murder and a fiber consistent with the victim's clothing was found in Appellant's boxer shorts. Evidence was also introduced that pubic hairs with the same microscopic characteristics as that of the victim were recovered from Appellant.

The blood found on the inner lining of Appellant's jacket was the same blood type as that of the victim and expert testimony established that a blood stain on the yellow shirt was consistent with having been produced by wiping blood from a blood-bearing object or instrument, like a knife. In addition to this blood stain, there were other blood stains on Appellant's jacket and on the yellow shirt that were caused by "spatter stains." These stains consisted of small blood droplets aligned in a distinct pattern and were created when a blood source was punctured. The small pinpoint droplets found in Appellant's jacket indicated that they were caused by a puncture wound made with great force.

Taking all of these circumstances together, a jury could conclude beyond a reasonable doubt that Jacqueline Lugo's death was a homicide. From the nature of the injuries to her body, a jury could infer that the homicide was intentional, malicious and premeditated. Finally, the jury could conclude from the types of blood stains on Appellant's garments and the bloody yellow shirt that he was seen wearing during the day and prior to the murder that Appellant committed the crime. Accordingly, we are satisfied that sufficient evidence exists in this record to support the jury's verdict of murder of the first degree, and dismiss Appellant's sufficiency chal-

lenge.[12]

Appellant also argues that various statements he made to the police were made when he was subject to a custodial interrogation and that because he was not advised of his constitutional rights against self-incrimination (*Miranda* warnings), these statements should have been suppressed along with the tangible evidence collected in response to these statements. Appellant further argues that in light of this initial violation of his constitutional rights, the incriminating statements he made following his finally being advised of his constitutional rights were also tainted and should have been suppressed in accordance with the "fruit of the poisonous tree" doctrine. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Appellant raised these issues in a pre-trial suppression motion which Appellant argues was improperly denied by the trial court.

In reviewing a trial court's suppression ruling, our initial task is to determine whether the factual findings are supported by the record. In making this determination, we must consider only the evidence of the prosecution's witnesses, and so much evidence of the defense that remains uncontradicted when fairly read in the context of the record as a whole. When the evidence supports the factual findings, we are bound

12. Appellant argues to us that insufficient evidence was submitted to establish that the killing was malicious, willful, deliberate or premeditated. This argument is meritless. Malice may be shown in a murder prosecution by proving that a defendant used a dangerous weapon on a vital part of another's body. *Commonwealth v. Hardcastle*, 519 Pa. 236, 546 A.2d 1101 (1988), *cert. denied*, 493 U.S. 1093, 110 S.Ct. 1169, 107 L.Ed.2d 1072 (1990). Additionally, this same evidence can be used by a jury to establish that a defendant had the "specific intent to kill," the court developed phrase used to express that a killing was willful, deliberate and premeditated. *Commonwealth v. Rolan*, 520 Pa. 1, 549 A.2d 553 (1988); *Commonwealth v. Yarris*, 519 Pa. 571, 549 A.2d 513 (1988); *Commonwealth v. Nelson*, 514 Pa. 262, 523 A.2d 728 (1987); *Commonwealth v. O'Searo*, 466 Pa. 224, 352 A.2d 30 (1976). As our review of the evidence above shows, more than enough evidence was submitted at trial to establish that Appellant used dangerous weapons on vital parts of the victim's body. Accordingly, sufficient evidence exists in this record to support the jury's conclusion that the killing was malicious, willful, deliberate and premeditated and Appellant's contrary argument is dismissed.

by such findings; we may reverse only if the legal conclusions drawn therefrom are erroneous. *Commonwealth v. Medley,* 531 Pa. 279, 612 A.2d 430 (1992); *Commonwealth v. Johnson,* 467 Pa. 146, 354 A.2d 886 (1976).

Viewed in this light, the suppression record reveals the following. When the police arrived at the crime scene at approximately 2:55 a.m., on September 17, 1989, they were met by Appellant and his father. Appellant admitted to the police that he called them to the scene and further explained that he found the victim as he was walking through the alleyway and noticed a door ajar on one of his father's garbage trucks. He also told the police that he found the victim in the front seat of the cab in an upright position behind the steering wheel. Appellant then explained to the police that he pulled the victim from the truck placing her on the ground approximately ten feet away from where he initially found her and that he covered the body. At this point, Appellant went to his father's house and told him of his discovery. Appellant's father then told Appellant to call the police which he did. Appellant related his account to the police while showing them where he had placed the body.

Following this initial conversation, the police conducted an investigation of the crime scene and asked Appellant to accompany them to City Hall to be interviewed. Appellant was told that he was being taken to City Hall as a witness and was driven to City Hall in the marked patrol car in which the police arrived. He was not frisked or handcuffed and when he arrived at City Hall he was asked to wait in an unlocked office for the arrival of the detective that normally questions witnesses in homicide cases. The officer in question, Detective George, had to be awakened because of the lateness of the hour and he arrived at City Hall within 45 minutes, at approximately 3:40 a.m., to conduct his conversation with Appellant. This interview was held in an unlocked room and Appellant was told twice he could leave if he so wished. Appellant was asked to draw a diagram of where he initially found the body and in response to this question, Appellant suggested it might be easier to return to the crime scene so

that he could actually show the area to the police. Detective George took Appellant back to the scene in an unmarked police car where he showed the officers where he found the body and how he moved it. Again, there is no evidence to show that Appellant was frisked or handcuffed or that the police car used to transport Appellant from City Hall to the crime scene and then back to City Hall was anything but a normal car with windows that opened from the inside and doors that locked from the inside.

Detective George testified that there were inconsistencies from the lighting conditions that he observed at the scene with the conditions that Appellant had described and he also observed blood stains on the inside of Appellant's jacket which seemed inconsistent with Appellant's claim that he got bloody while dragging the victim's body. Once back at the police station, Detective George asked Appellant to take a polygraph test and Appellant then asked whether he could call his father. Detective George answered that Appellant could call anyone he wished and during Appellant's conversation with his father, Detective George overheard the word "lawyer" and then he advised Appellant that he would help him contact an attorney if he so wished. When Appellant finished his conversation with his father, Appellant indicated that he would take the polygraph test and Detective George told Appellant he was free to leave City Hall at that time, but Appellant indicated he would rather stay to straighten out the situation.

While waiting for the officer to arrive to give him the polygraph test, Appellant laid down on a couch in the unlocked witness-victim room. He was alone in this room, unsupervised, without handcuffs and the door was open. Prior to the beginning of the test, Sergeant Stajkowski, who administered the polygraph test, read Appellant his *Miranda* warnings and Appellant waived these warnings and took the test. During the test, his freedom was unrestricted and he actually went to the men's room unaccompanied at approximately 9:30 a.m. He returned to finish the test and other breaks were taken during the test and he was provided food at various intervals. After the test was completed, Appellant fell asleep in a cubicle

in City Hall where he remained until 1:20 p.m., when he was arrested. Up until this time, Appellant remained in unlocked surroundings, was never handcuffed or frisked and had unrestricted access to leave City Hall.

Appellant argues, however, that from the time he was asked to come to City Hall at approximately 3:30 a.m., he was subjected to a custodial interrogation and, therefore, he should have been advised of his constitutional right to remain silent at that time. Appellant cites that he was taken to City Hall in a "prisoner's cage" section of a police car, was not allowed to wash once he arrived at City Hall and had to wait 45 minutes for the arrival of Detective George as being consistent with police conduct which would make one believe that their freedom of action had been curtailed. Because *Miranda* warnings were not given, Appellant argues that all the evidence acquired against him was illegally obtained and that it should have been suppressed. We disagree.

Before an individual is subjected to a custodial interrogation, he must make a knowing and intelligent waiver of his privilege against self-incrimination and right to counsel after adequate warning as to those rights. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Whether a person is in custody for *Miranda* purposes depends on whether the person is physically denied of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation. *Commonwealth v. O'Shea,* 456 Pa. 288, 318 A.2d 713 (1974), *cert. denied,* 419 U.S. 1092, 95 S.Ct. 686, 42 L.Ed.2d 685 (1974). Moreover, the test for custodial interrogation does not depend upon the subjective intent of the law enforcement officer interrogator. Rather, the test focuses on whether the individual being interrogated reasonably believes his freedom of action is being restricted. *Commonwealth v. Brown,* 473 Pa. 562, 375 A.2d 1260 (1977).

Applying this standard to the record before us, we conclude that at the time Appellant was initially brought to

City Hall the police officers did not place Appellant in a situation in which he could have reasonably believed that his freedom of movement was restricted. He was transported to City Hall in the back seat of the police cruiser in which the police arrived (which Appellant calls the prisoner's cage) and was not frisked or placed in handcuffs during the trip to City Hall or thereafter. Moreover, he was not placed in a secured waiting area even when he was being interrogated in City Hall. The police had no reason to believe that Appellant was involved in a homicide at this time especially since Appellant placed the initial call to the police telling them to come the crime scene. Accordingly, we reject Appellant's assertion that the significance of the conduct of the police when they asked him to come to City Hall for questioning under these circumstances was such that his freedom of movement had been restricted. Rather, it appears that the police's conduct at this time was entirely consistent with the questioning of a cooperative witness who had reported a crime and who might have significant information to convey to the police.

Our conclusion in this regard remains unaffected by the subsequent developments once Appellant arrived at the police station. Appellant was not handcuffed or frisked once he arrived at City Hall and was not put in a locked or guarded room. He was fed and told many times that he was free to leave and it appears that he voluntarily stayed at City Hall until the polygraph test was completed. Additionally, if Appellant did not take the time to wash off his blood-soaked body it was not because he was prevented from doing so by the police. To the contrary, it appears that Appellant never showed any interest in washing-up and since he had free access to the bathrooms we can only conclude that if Appellant wished to clean up he was at liberty to do so. We are mindful, of course, that Appellant had to wait for 45 minutes until Detective George arrived at City Hall but, as already indicated, Appellant was not placed in a locked room nor was he handcuffed and he was told he was to be questioned as a witness and not as a suspect. We see no reason to disturb the trial court's findings that Appellant was not in custody during

his initial interview, second visit to the crime scene, and return to City Hall up until the time he was actually read his *Miranda* rights.

Accordingly, any evidence acquired during the pre-warning interviews was properly acquired and not subject to suppression. Since we find no violation of Appellant's constitutional rights during this questioning, the post-warning evidence was not tainted and was properly admissible at trial. Appellant's contrary arguments are dismissed as meritless.

Since we have determined that sufficient evidence supports the verdict of murder of the first degree and have rejected Appellant's argument of trial court error, the verdict of murder of the first degree must be affirmed and we now proceed to consider Appellant's arguments of errors which occurred during the penalty phase.[13]

Appellant argues that the trial court erred in allowing the Commonwealth to introduce evidence concerning Appellant's history of prior felony convictions at the sentencing hearing. This claim is made based on Appellant's assertion that the Commonwealth failed to follow the requirements of Pa. Rule of Criminal Procedure 352 in giving timely notice to Appellant of the aggravating circumstances which it intended to submit at the sentencing hearing.[14]

---

**13.** Appellant, through his first appellate counsel, raised as an additional allegation of trial court error that the prosecutor was permitted, during closing argument, to remark adversely on the absence of certain defense witnesses. Counsel failed to note, however, that the comment was made in direct response to trial counsel's reference to the absence of these witnesses and, as such, was permissible as a proper response by the prosecutor to remarks inspired by the defense itself. *Commonwealth v. Floyd*, 506 Pa. 85, 484 A.2d 365 (1984).

**14.** Pa. Rule of Criminal Procedure provides for the following:

The Commonwealth shall notify the defendant in writing of any aggravating circumstances which the Commonwealth intends to submit at the sentencing hearing. Notice shall be given at or before the time of arraignment, unless the attorney for the Commonwealth becomes aware of the existence of an aggravating circumstance after arraignment or the time for notice is extended by the court for cause shown.

Specifically, Appellant argues that, under Rule 352, the Commonwealth is required to notify Appellant at the arraignment of all the aggravating circumstances which would be presented against him at any penalty hearing and that at the November 17, 1989, arraignment, the Commonwealth formally notified Appellant that it would seek to establish as aggravating circumstances (1) that the killing was perpetrated during the commission of a felony,[15] and that the offense was committed by means of torture[16]. One year later, on November 28, 1990, the Commonwealth filed a motion before the trial court seeking to amend their Rule 352 notification to include the circumstance that Appellant had a significant history of felony convictions involving the use or threat of violence to the person[17].

Appellant further argues that the Commonwealth's notice was not made until after jury selection had begun (on the second day of jury selection) and that by this late date he and defense counsel were preoccupied with selecting a jury and preparing for the rigors of trial and were not in a position to consider or assess what the effect of the addition of this aggravating circumstance to their case at the sentencing hearing would be. Appellant stresses that his history of convictions was always available to the Commonwealth and its attempt to amend its Rule 352 notice to add an aggravating circumstance which it was or should have been aware of violates the rule and should not be permitted. Appellant concludes from these circumstances that he was not given sufficient time or information to prepare for the sentencing hearing within the meaning of Rule 352 and that it was error for the trial court to allow evidence of this aggravating circumstance to be admitted at the sentencing hearing.

The Commonwealth argues that it was not aware of Appellant's prior convictions and that Appellant's November 20, 1979, conviction for criminal attempt to commit involuntary deviate sexual intercourse or his March 17, 1980, burglary

15. 42 Pa.C.S. § 9711(d)(6).
16. 42 Pa.C.S. § 9711(d)(8).
17. 42 Pa.C.S. § 9711(d)(9).

conviction were not discovered until November 28, 1990, but that as soon as they discovered these felony convictions they filed their motion, satisfying their burden that notice be given promptly when a circumstance becomes known to the Commonwealth. Moreover, the Commonwealth argues that trial counsel never sought a continuance nor did Appellant establish any prejudice by the filing of the motion to amend.

Our Rule of Criminal Procedure 352 was adopted on February 1, 1989, and became effective on July 1, 1989. Prior to that time, no Rule or statute provided a specific procedure for notice in such circumstances and we held that an accused would be on notice that a court could admit any matter deemed to be relevant and admissible on the question of the proper sentence to be imposed, including *any* aggravating circumstance. *Commonwealth v. Edwards,* 521 Pa. 134, 555 A.2d 818 (1989). Our adoption of Rule 352, however, has now filled in this apparent procedural void and requires the Commonwealth to give notice of the precise aggravating circumstances it intends to prove at a sentencing hearing at or before the time of *arraignment.* The Rule, as pointed out in the Comment, is intended to give the defendant sufficient time and information to prepare for the sentencing hearing.

The Rule also represents a significant departure from the prior practice which allowed the Commonwealth the unfettered right to announce at any time which aggravating circumstances it would seek to prove, and requires that the Commonwealth make its choices very early on, at the time of arraignment, from the information available to it at that time. The Rule allows the Commonwealth to amend its notice if it notifies the defendant promptly of the existence of an additional aggravating circumstance after arraignment and the Commonwealth relies on this portion of the comment to the rule to justify its conduct in notifying Appellant that it would seek to establish Appellant's significant history of prior felony convictions upon the assertion that notice was given as soon as these convictions were discovered.

 It is undisputed, however, that both prior convictions arose out of criminal conduct that occurred in Berks County, were prosecuted in Berks County, and that the records of these cases were always available to the prosecutor both prior to arraignment and subsequent thereto. This circumstance raises the question of whether the prosecutor, who has access to such records at all relevant times, should be required to ascertain whether a defendant has a prior history of felony convictions by the time of arraignment and to notify the defendant by that time of whether the Commonwealth will submit this evidence at the sentencing hearing. We respond in the affirmative because the information already exists, is easily available to the prosecutor by the exercise of reasonable diligence and because the intent of the rule is to give the defendant notice *as soon as possible* of circumstances which the Commonwealth intends to submit at the sentencing hearing.

Here, there is no question that a search of the Berks County criminal dockets would have revealed the very information that was not "discovered" for over one year at or before the time of arraignment. Because of the easy availability of such information, we conclude that the prosecutor was required to search for this information and to determine by the time of the arraignment whether it would notify Appellant of its intent to use such evidence against him at the sentencing hearing.

 We additionally reject the Commonwealth's suggestion that its discovery of Appellant's prior felony convictions on the second day of jury selection and immediate notice on the same day satisfies the rule's requirement that notice be given once the prosecutor becomes *aware* of the existence of an aggravating circumstance after arraignment. These convictions were over ten years old and, as already noted, were always available to the prosecutor. Under these circumstances, the prosecution was neither diligent in becoming aware of these convictions nor was it prompt in notifying

80

Appellant.[18]

■ In those situations where information cannot be obtained at or prior to arraignment, the prosecution is permitted to amend its Rule 352 notice for "cause shown." The comment to the rule explains "The language for 'cause shown', contemplates, for example, a situation where, at the time of arraignment, an ongoing investigation of an aggravating circumstance must be completed before the prosecutor can know whether the evidence is sufficient to warrant submitting the circumstance at the sentencing hearing." In such circumstances, the Commonwealth is more than justified in amending its Rule 352 notice and the court can determine whether a legitimate reason exists to allow the amendment. No such situation is presented by these facts and we conclude that the trial court erred in allowing the amendment and in permitting evidence of Appellant's prior felony convictions at the sentencing hearing to establish the aggravating circumstance that Appellant had a significant history of felony convictions involving the use or threat of violence to the person (42 Pa.C.S. § 9711(9)).

■ Since the sentencing jury improperly heard evidence on aggravating circumstance 9, their finding with regards to that aggravating circumstance is insupportable and a new sentencing hearing will have to be conducted. Where we strike down an aggravating circumstance and other aggravating circumstances are present along with a finding of a mitigating circumstance, we are not in a position to determine whether the lack of the aggravating circumstance struck down would have changed the jury's determination and, pursuant to 42 Pa.C.S. § 9711(h)(4), we are required to vacate the penalty

18. The prejudice which occurs from this type of notice during jury selection is rather self-evident. By the time a case has matured to the point where a jury is to be selected, counsel and the defendant are concentrating on selecting the best possible jurors and are preparing for the rigors of a trial which has life or death implications for the defendant. To burden the defense, at this point in time, with considerations which could and should have been brought to their attention at or before arraignment forces the defense to shift its concentration from the matters at hand (jury selection and trial) wherein lies the prejudice. The Commonwealth's contrary suggestion is rejected as meritless.

of death and remand for a new sentencing hearing. At that sentencing hearing, the Commonwealth will be limited to presenting evidence on aggravating circumstances 6 and 8 (pursuant to its original Rule 352 notice). As suggested by the comment to Rule 352, "No additional notice is required for those aggravating circumstances previously offered and not struck down upon review." [19]

Accordingly, for all the above reasons, the verdict of guilt on the charge of murder of the first degree is affirmed, the sentence of death is vacated and the matter is remanded for a new sentencing hearing.

CASTILLE, J., files a concurring and dissenting opinion in which MONTEMURO, J., joins.

MONTEMURO, J., files a concurring and dissenting opinion in which CASTILLE, J., joins.

MONTEMURO, J., is sitting by designation.

CASTILLE, Justice, concurring and dissenting.

I join the majority's affirmance of the guilty verdict. However, I disagree with the majority's analysis of Pennsylvania Rule of Criminal Procedure 352; therefore, I respectfully dissent.

The majority awards appellant a new sentencing hearing because the Commonwealth did not advise him at or before his arraignment pursuant to Pa.R.A.P. 352 that it intended to use his criminal record as a third aggravating circumstance notwithstanding that this information was obviously and clearly within appellant's own personal knowledge. The purpose of Rule 352 is clear. "It is intended to give the defendant sufficient time to prepare for the *sentencing* hearing." *Comment,* Pa.R.Crim.P. 352 (1992) (emphasis added). Here, jury selection began on November 26, 1990. The Commonwealth specifically became aware of appellant's prior criminal convic-

---

**19.** In light of our disposition of this matter it is unnecessary for us to consider Appellant's final argument, whether the prosecutor was improperly permitted to read inflammatory information to the jury at the sentencing hearing to establish aggravating circumstance nine (9).

tions on November 28, 1990 and advised appellant's counsel on that same date of its intention to use his prior convictions as an additional aggravating circumstance. Trial testimony did not begin until January 9, 1991, five and a half weeks after the Commonwealth notified appellant's counsel of its intention to use the additional aggravating circumstance at sentencing. On January 23, 1991 trial testimony concluded and the jury convicted appellant of first degree murder. The sentencing phase of trial itself did not begin until January 24, 1991, nearly *two months* after the Commonwealth notified appellant's counsel of its intention to use appellant's criminal record as a third aggravating circumstance. Finally, on January 25, 1991, the jury sentenced appellant to death. Certainly, two months is more than sufficient time to prepare for sentencing. Accordingly, the Commonwealth clearly satisfied the purpose of Rule 352.

Moreover, the Commonwealth's post-arraignment notification fell within the exception to Rule 352. Pennsylvania Rule of Criminal Procedure 352 provides:

The Commonwealth shall notify the defendant in writing of any aggravating circumstances which the Commonwealth intends to submit at the sentencing hearing. Notice shall be given at or before the time of arraignment, *unless the attorney for the Commonwealth becomes aware of the existence of an aggravating circumstance after arraignment or the time for notice is extended by the court for cause shown.* (emphasis added).

Pa.R.Crim.P. 352. Here, the Commonwealth immediately notified the defense of the third aggravating circumstance when they became aware of it. Therefore, the Commonwealth clearly satisfied the exception to Rule 352.

The majority, however, holds that where information concerning a defendant's prior felonious criminal history could have been discovered by the Commonwealth had it exercised reasonable diligence pre-arraignment, the prosecutor is barred from using such information if it is not disclosed at or before arraignment. Nothing in the plain meaning of Rule 352, however, imposes an affirmative duty upon the Commonwealth

to conclude its investigative conduct, such as the ascertainment of a defendant's criminal record, at or before arraignment. Rather, Rule 352 imposes upon the Commonwealth only the duty to disclose what they *know at or before arraignment* so as not to prejudice the defendant by inadequate time to prepare a defense to the aggravating circumstances. Here, the information was not known to the Commonwealth until *after* arraignment although appellant, as the convicted felon, had possessed this information for at least ten years prior to his trial. It is difficult to comprehend the majority's harsh penalty upon the prosecution for a supposed lack of due diligence in learning the defendant's prior record. It is even more difficult to comprehend the majority ascribing to the convicted individual a *tabula rasa* of ten years duration, which was only a decade later inscribed with a surprising reminder of his felonious misdeeds. There is no allegation of record that defense counsel was unaware of these convictions especially since the individual *most* aware of the convictions sat at counsel table with counsel.

Furthermore, the majority asserts that the Commonwealth's notice of the third aggravating circumstance during jury selection prejudiced appellant because it possibly shifted the focus from jury selection to the sentencing phase. I would find that such a conclusion calls for sheer speculation given the facts of this matter. Notwithstanding that two months is sufficient time to prepare for the introduction of appellant's criminal record at the penalty phase of trial, had the defense felt so burdened by the additional aggravating circumstance, it could have requested a continuance. Indeed, I submit that the defense's failure to request a continuance in and of itself demonstrates that the defense felt unprejudiced by the post arraignment disclosure of the information. Moreover, this assertion of prejudicial distraction during jury selection is equally unpersuasive, especially where the Commonwealth notified the defense that they were seeking the death penalty on November 17, 1989, approximately one year and nine months *before* jury selection began. Surely, the defense was selecting a jury with that in mind.

This Court should not reward the defendant a new death penalty hearing where the third aggravating circumstance comes as no surprise to counsel or to the defendant. To the extent there may have been any surprise on behalf of the defense in learning of appellant's prior history, such surprise was by virtue of defense counsel's own failure to search the police files for these convictions, or simply to inquire of appellant this same information. The majority's holding effectively elevates form over substance and raises technicality to a high art form. Accordingly, I dissent from the majority and would affirm the sentence of death.

MONTEMURO, J., joins in this concurring and dissenting opinion.

MONTEMURO, Justice, concurring and dissenting.

I agree with the Majority's sufficiency review and join the Majority to the extent that it affirms the verdict of guilt. I disagree, however, with the Majority's interpretation of Rule 352 and respectfully dissent.

The Majority would vacate the sentence of death and remand for a new sentencing hearing for the following reasons: first, the information about the appellant's past felony convictions already existed; second, that information was easily available to the prosecutor, upon the exercise of reasonable diligence; third, the purpose of the rule is to give the defendant notice, as soon as possible, of the aggravating circumstance the Commonwealth will pursue; and fourth, the appellant was prejudiced.

The Majority establishes an affirmative duty on the part of prosecutors to discover all existing aggravating circumstances prior to arraignment. I think this reading unnecessarily expands Rule 352. The plain language of the Rule allows the Prosecutor to give notice of an aggravating circumstance after arraignment—when the prosecutor "becomes aware" of its existence. The purpose of this rule, as set out in the Comment following the Rule, is to afford the defendant sufficient time to prepare for the sentencing phase. Not, as the Majority suggests, to give notice as soon as possible. In this matter

the defendant had two months to prepare for the sentencing phase of his trial. The notice afforded Williams gave him sufficient time to prepare for that part of the trial.

Furthermore, the Majority writes that "the prejudice which occurs from this type of notice during jury selection is rather self-evident." Majority Opinion p. 80 n. 18. The Majority states that notifying the defense of a third aggravating circumstance during jury selection causes the defense to switch its attention from the task at hand, and to focus on the sentencing phase. I disagree. The defense was already aware that the Commonwealth was seeking the death penalty and was selecting a jury with that in mind. The addition of a third aggravating factor did not prejudice the defense. The defense had two months between the time of notice and the sentencing phase. That two months constituted sufficient time for the defense to prepare for the penalty phase of the trial. Had the defense felt that the addition of a third aggravating circumstance prejudiced its case, the defense could have moved for a continuance.

Accordingly, I dissent from the Majority and would affirm the sentence of death.

CASTILLE, J., joins in this concurring and dissenting opinion.