COMMONWEALTH of Pennsylvania, Appellant,

v.

Larry R. FOX, Appellee.

Superior Court of Pennsylvania.

Submitted Dec. 17, 1996.

Filed May 22, 1997.

Ronald Elliott, Assistant District Attorney, New Bethlehem, for Commonwealth, appellant.

Ralph L.S. Montana, Clarion, for appellee.

Before DEL SOLE, POPOVICH and HESTER, JJ.

POPOVICH, Judge.

This is an appeal by the Commonwealth from the order of the Court of Common Pleas of Clarion County which suppressed the inculpatory statements which appellant, Larry Fox, made to police concerning his alleged sexual intercourse with his minor daughter. Upon review, we find that the lower court erred in suppressing appellee's statements, and, accordingly, we reverse the suppression court's order and remand for trial.

Herein, the Commonwealth complains: 1) The trial court erred in finding that appellee was in custody at the time of his interrogation; 2) The trial court erred in finding that appellee was not advised of the nature of the interrogation prior to its initiation by Trooper Davis of the State Police, and, consequently, appellee's waiver of his *Miranda* rights was not effective; 3) The trial court erred in suppressing appellee's voluntary statement to State Trooper John Krajnikovich of the State Police.[1]

1. The Commonwealth also contends that the lower court erred in failing to find that appellee had waived "issues" which he raised in his omnibus pre-trial motion but did not brief for the court

below. We will not anticipate the trial court's ruling on pre-trial issues which the court did not address because its resolution of the suppression motion substantially handicapped the prosecu-

In *Commonwealth v. Romine*, 453 Pa.Super. 42, 682 A.2d 1296, 1298 (1996), we set forth the standard of review to be applied when the Commonwealth appeals an adverse suppression ruling as follows:

> ... "we must consider only the evidence of the defendant's witnesses and so much of the evidence of the prosecution as read in the context of the record as a whole remains uncontradicted." *Commonwealth v. DeWitt*, 530 Pa. 299, 302, 608 A.2d 1030, 1031 (1992). In reviewing the ruling of a suppression court,
>
> > [w]e must determine whether the factual findings are supported by the record and, assuming there is support in the record, we are bound by the facts and may reverse if the legal conclusions drawn from those facts are in error. *Commonwealth v. Cortez*, 507 Pa. 529, 491 A.2d 111 (1985), *cert. denied*, 474 U.S. 950, 106 S.Ct. 349, 88 L.Ed.2d 297 (1985)
>
> *Commonwealth v. Shiflet*, 431 Pa.Super. 444, 447, 636 A.2d 1169, 1170 (1994).

Applying the foregoing standard to the case before us, we find that the record reveals these facts as set forth by the lower court as follows:

> On March 9, 1995 Trooper Louis Davis (Trooper Davis) of the Pennsylvania State Police received a telephone call from a caseworker at Clarion County Children and Youth Services (CYS) informing him that a child had reported to a school counsellor that she had been sexually molested by her father and requesting Trooper Davis to accompany the caseworker to the initial interview. On the same day Trooper Davis and the CYS caseworker went to Defendant's residence in Shippenville, Pennsylvania and, in the presence of her mother, interviewed Defendant's 14 year old daughter (the Victim).
>
> The Victim told Trooper Davis that Defendant had been sexually molesting her since she was 7 or 8 years old, but Trooper Davis was only able to specifically identify and describe three separate occasions for the purpose of filing charges. Trooper Davis charged the Defendant with acts which took place from March 1, 1992 to March 3, 1992, which acts were the basis for charges of Involuntary Deviate Sexual Intercourse (18 Pa.C.S.A. § 3123(5)), Statutory Rape (18 Pa.C.S.A. § [3]122), and Indecent Assault (18 Pa.C.S.A. § 3126(a)(6)). Defendant was also charged with acts committed in May of 1994 constituting Statutory Rape (18 Pa.C.S.A. § [3]122), Indecent Assault (18 Pa.C.S.A. § 3126(a)(6)), Incest (18 Pa.C.S.A. § 4302) and two counts of Aggravated Indecent Assault (18 Pa.C.S.A. § 3125(1)(6)). Trooper Davis also charged Defendant with the crime of Indecent Assault (18 Pa.C.S.A. § 3126(a)(1)) which allegedly took place in February of 1995.
>
> Trooper Davis knew Defendant because Defendant was employed by the Department of Transportation and worked in a building next door to the police barracks approximately two miles from Defendant's house, and Defendant also had a part time job as a mechanic and worked on state police vehicles. Defendant is illiterate and has a full scale I.Q. of 71. (N.T. at 171—174)
>
> At the conclusion of the interview with the Victim, Defendant's wife told Trooper Davis that she was afraid that Defendant would be mad when he got home because the Victim had divulged what happened. Trooper Davis was told that Defendant would get off work at the Department of Transportation building at noon and Trooper Davis therefore called Trooper John Krajnikovich (Trooper Krajnikovich) at the police barracks and asked him to go next door and bring Defendant to the barracks for questioning. Trooper Davis intended to arrest Defendant based upon the

---

tion and prompted the Commonwealth to appeal. If the Commonwealth had specific "issues" about which it was concerned, it should have set forth those issues herein for our review. Since it failed to do so, it has waived is claim, and we will not rule upon this general and vague claim by the Commonwealth. We note, however,

should the lower court render any other pre-trial decisions which the Commonwealth certifies as substantially handicapping the prosecution, it is free to appeal that pre-trial decision. *See, Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382 (1985).

information he received from the Victim whether or not Defendant was willing to make any admission.

Trooper Krajnikovich went to the Department of Transportation building and asked Defendant to come with him to the police barracks. Defendant was not told why he was going to the police barracks and believed that he may be going there to fix a vehicle. Trooper Krajnikovich took Defendant to Trooper Davis's office and the two of them waited for Trooper Davis to arrive. At no time did Trooper Krajnikovich tell the Defendant anything about the investigation or why Trooper Davis wanted him to come to the police barracks. Defendant asked Trooper Krajnikovich if he could get something to drink and smoke a cigarette and Trooper Krajnikovich said that he could not.

Trooper Davis and the caseworker arrived and entered the room and closed the door. Trooper Davis told Defendant that he was doing an investigation concerning Defendant and his daughter and said he wanted to talk to Defendant. (N.T. at 12) Trooper Davis did not tell Defendant anything about the daughter's allegations and mentioned nothing about allegations of sexual misconduct. (N.T. at 12 and 37)

At this point Trooper Davis read Defendant the *Miranda* warning, and Defendant told him he understood his rights and, when asked if he wanted to talk with Trooper Davis without an attorney, said, "yeah." (N.T. at 12 & 13) At no time after Defendant entered the interrogation room would he have been permitted to leave even had he asked to go or attempted to go. (N.T. at 73)

At the time the *Miranda* warning was read to Defendant, he reasonably believed that his freedom of action or movement was restricted. At the time the *Miranda* warning was read to Defendant, he was totally unaware of the general nature of the transaction giving rise to the interrogation because he had not been told and had no reason to believe that he was going to be asked about sexually molesting his daughter.

Immediately after the *Miranda* warning was read to Defendant and he stated that he wished to talk to Trooper Davis, Trooper Davis told Defendant that his daughter was accusing him of having sex with her. Defendant dropped his head and started to cry and stated that he had had sex with her only once. When he asked if he could possibly go to jail, and Trooper Davis told him that it was very serious, Defendant stated that he wanted Trooper Davis to call Attorney Ralph Montana, who is the attorney now representing Defendant.

When this request was made by Defendant, all interrogation stopped and Trooper Krajnikovich took Defendant into another room to process photographing and fingerprinting. Trooper Krajnikovich asked no questions of Defendant and no conduct of Trooper Krajnikovich was calculated to, expected to, or likely to, evoke admissions. (See *Commonwealth v. Simala*, 434 Pa. 219, 226, 252 A.2d 575 (1969)) Defendant asked Trooper Krajnikovich if, "this was going to be in the papers", and Trooper Krajnikovich told him that the newspapers had access once the charges were filed. Defendant then said, "I just don't want anyone to know what I have done." (N.T. at 55) (footnotes omitted).

Based upon those facts, the lower court concluded appellee was in custody at the time of his interrogation by Trooper Davis, appellee waived his *Miranda* rights prior to knowing the subject of the interrogation, and, thus, his statements must be suppressed in accordance with our Supreme Court's decision in *Commonwealth v. Dixon*, 475 Pa. 17, 379 A.2d 553 (1977). The lower court also ruled that appellee's statement to Trooper Krajnikovich must be suppressed because it was "inextricably intertwined" with his prior admission to Trooper Davis. However, upon review, we are convinced that the lower court has interpreted and applied *Dixon, supra*, in an overly technical manner. We believe there is a significant distinction between the facts *sub judice* and those of *Dixon, supra*, such that *Dixon, supra*, does not require suppression in the present case. Having determined that appellee's statement to Trooper Davis is admissible, we find that

his statement to Trooper Krajnikovich is also admissible.

■ The Commonwealth first suggests that appellee was not subjected to a custodial interrogation when interviewed by Trooper Davis at the State Police Barracks. Citing *Commonwealth v. Williams*, 539 Pa. 61, 650 A.2d 420 (1994), the Commonwealth argues that appellee did not believe he was in custody, so the protection of *Miranda, supra* were not applicable at the time of his interrogation. The Commonwealth reaches this conclusion by conveniently ignoring the express language of *Williams, supra*, as emphasized below:

> Whether a person is in custody for *Miranda* purposes depends on *whether the person is physically denied his freedom of action in any significant way* or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by interrogation. *Commonwealth v. O'Shea*, 456 Pa. 288, 318 A.2d 713 (1974), *cert. denied*, 419 U.S. 1092, 95 S.Ct. 686, 42 L.Ed.2d 685 (1974).

*Williams*, 650 A.2d at 427.

While appellee may have believed he was brought to the police barracks to repair a police cruiser, it is crystal clear from the Troopers' testimony that he was not free to leave the barracks and was going to be arrested. Moreover, as the lower court correctly noted, any notion that appellee had that he was free to leave the police interrogation room "certainly ... evaporated when he heard the [*Miranda*] warnings read." Trial Court Opinion, p. 8. We cannot fault the lower court's determination that appellee was subjected to a custodial interrogation.

■ We turn now to the lower court's conclusion that appellee waived his *Miranda* rights prior to knowing the subject of the interrogation, and, thus, his statements must be suppressed in accordance with our Supreme Court's decision in *Commonwealth v. Dixon*, 475 Pa. 17, 379 A.2d 553 (1977). As previously stated, we are convinced that the holding of *Dixon, supra*, does not mandate suppression under the facts before us.

In *Dixon*, 379 A.2d at 556, our Supreme Court, citing *Commonwealth v. Richman*, 458 Pa. 167, 320 A.2d 351 (1974), stated, "a valid waiver of *Miranda* rights requires that the suspect have an awareness of the general nature of the transaction giving rise to the investigation." Further, "[t]he rationale of this holding was that it is only when such knowledge is possessed by a suspect that he can be said to understand the consequences of yielding the right to counsel." *Dixon*, 379 A.2d at 556.

In *Dixon, supra*, Linda Dixon was arrested by police who were armed with a warrant which was issued because of her failure to make restitution for a five-month-old malicious mischief conviction. At the police barracks, Linda Dixon signed a *Miranda* waiver, and interrogation immediately commenced. However, the questions did not concern her malicious mischief conviction (the superficial reason for her arrest), but rather focused upon the death of Christopher Dixon, Linda's son, whose decomposed body was discovered three weeks earlier in a wooded area of Stroud Township. Linda Dixon was shown a black and white photograph of her child and asked "Where is Chrissy?", whereupon she broke into tears and wept for ten minutes. When she stopped crying, she told police, "I did it." Upon further questioning, she related the details of the child's death to the officers.

In concluding that Linda Dixon's statements were subject to suppression, our Supreme Court highlighted the fact that at the time she signed the *Miranda* waiver, Linda Dixon could have thought she was to be questioned concerning her malicious mischief conviction, not the murder of her child. This "palpable ambiguity" which went unclarified by her interrogators invalidated her "knowing and intelligent" waiver of her constitutional rights. *Dixon*, 379 A.2d at 557. Our high court would not find she validly waived her constitutional rights "simply because [she] lacked the presence of mind to halt the interrogation and assert [her] constitutional rights the moment [she] was asked a question that revealed the nature of the criminal episode under investigation." *Dixon*, 379 A.2d at 557.

Presently, appellee was clearly the subject of a custodial interrogation by Trooper Davis

on March 9, 1995. The police planned to question appellee concerning his daughter's allegation that he sexually molested her over a period of seven years with at least one event occurring during the prior month. At the police barracks, Trooper Davis and a social worker entered the room where appellee was being held. *Trooper Davis told appellee that he was doing an investigation concerning Fox and his daughter.* Appellee then was given his *Miranda* rights, and he told Trooper Davis that he understood his rights. When asked whether he wanted to talk with Trooper Davis without an attorney, appellee responded, "yeah."

As lower court found:

> Immediately after the *Miranda* warning was read to Defendant and he stated that he wished to talk to Trooper Davis, Trooper Davis told Defendant that his daughter was accusing him of having sex with her. Defendant dropped his head and started to cry and stated that he had had sex with her only once. When he asked if could possibly go to jail, and Trooper Davis told him that it was very serious, Defendant stated that he wanted Trooper Davis to call Attorney Ralph Montana, who is the attorney now representing Defendant.

Trial Court Opinion, p. 5.[2]

Upon review of the the circumstances attending the interrogation, we conclude that a preponderance of the evidence established that appellee knew the "occasion for the interrogation" at the time he waived his rights. See, *Dixon*, 379 A.2d at 556 (standard of review). Prior to being given his *Miranda* warning, Trooper Davis told appellee that his investigation involved him and his daughter. Immediately after administration of *Miranda* warnings and *before any questioning*, Trooper Davis told appellee that his daughter had accused him of sexually molesting her. In this case, there was absolutely no "ambiguity concerning the direction and purpose of the interrogation". Larry Fox was told that his daughter had accused him of sexually assaulting her prior to the interrogation.

The lower court held that appellee was not expressly advised of the reason for the interrogation *prior to his waiver* and, consequently, his waiver was not "knowing and intelligent". However, such a hyper-technical application of *Dixon, supra*, ignores the facts that appellee knew the questioning would concern him and his daughter and that at least one of the incidents of abuse took place during the previous month. *Cf., Commonwealth v. Carr*, 398 Pa.Super. 306, 580 A.2d 1362, 1365–66 (1990) (proximity in time of event to interrogation is a relevant factor in determining whether waiver of constitutional rights was "knowing and intelligent"). We are convinced that appellee understood the interrogation concerned his sexual relationship with his daughter, a fact which Trooper Davis expressly emphasized before questioning appellee.

It is most important to note that appellee made his initial inculpatory statement, not in response to questions concerning his molestation of his daughter, but rather he admitted to having "sex with her" after an explanation of the subject of the interrogation. Simply put, appellee was fully aware of the situation prior to any questions being asked. Thus, not only was appellee's statement not the product of interrogation, but also appellee was not caught off-guard when "a question revealed the nature of the criminal episode under investigation." This distinguishes the present case from that of *Dixon, supra*, wherein the arrest of Linda Dixon was based upon grounds unrelated to the basis of her interrogation and she learned of the nature of the criminal investigation *only* through the questions which she was asked. *Herein, appellee was advised of the nature of the interrogation before it began, and, accordingly, he possess the necessary information to make an intelligent waiver of his Miranda rights or to reject that waiver before the interrogation began.*

The problem presented by the facts before us is that Larry Fox's inculpatory statements

---

**2.** All interrogation stopped after Fox's request for counsel. After he was photographed and fingerprinted, Fox asked Trooper Krajnikovich if "this was going to be in the papers", and the trooper told him that the newspapers had access to the information once the charges were filed. Fox then stated, "I just don't want anyone to know what I have done."

were made upon his realization that his daughter had accused him of sexual abuse. Questioning was not needed to elicit Larry Fox's statement, and we are convinced suppression is not appropriate in this case. Having determined that appellee's statement to Trooper Davis is admissible, we find that his statement to Trooper Krajnikovich is also admissible since no reason for its suppression other than its connection to his initial statement has been offered in support of its exclusion by the court below.

Accordingly, we reverse the suppression order of the court below and remand for trial.

Order reversed. Case remanded for trial. Jurisdiction relinquished.