## ORDER

**In re F.Z.**

*Sophia Polites*, for Commonwealth
*Michael Sonchi*, for F.Z.

SMYTH, *J.*, April 30, 2014—In this juvenile-delinquency proceeding, counsel for the minor filed a motion pursuant to Pa.R.J.C.P. 350 to suppress his statements given in response to police questioning about his having sex with his minor sister, as taken in violation of his rights under the United States and Pennsylvania Constitutions, U.S. Const. amends. V, VI, XIV; Pa. Const. art. I, § 9. (Suppression Tr. 3-4, Apr. 11, 2014.) The court held a hearing on the motion, at which a single witness, the interviewing police detective, testified. We now enter of record these findings of fact and conclusions of law under Pa.R.J.C.P. 350(C), which provides,

> At the conclusion of the hearing, the court shall enter on the record a statement of findings of fact and conclusions of law as to whether the evidence was obtained in violation of the juvenile's rights, or in violation of these rules or any statute, and shall make an order granting or denying the relief sought.

Pa.R.J.C.P. 350(C).

The facts as to the conduct of the interview are basically not in dispute, and are as related in the notes of testimony of the juvenile detective at the hearing. For purposes of clarifying our ruling, we state them simply as follows.

The parents of the juvenile brought him in to the police station under the pretext he was to speak with the detective about a diversionary program for an unrelated theft. (Suppression Tr. 6-13, 35-40.) In fact, the purpose of the interview was to ask the juvenile about allegations he had had sex with his sister.

The juvenile sat in the detective's office between his mother and father. The detective told the juvenile that even though his parents had brought him he did not have to talk to the detective and was free to leave. (Suppression Tr. 9-10.) The detective began to talk about the juvenile's diversionary program for about ten minutes, then "used that as a [segue]" (Suppression Tr. 12:13) to discuss his sister with him. The detective then confronted the juvenile with the allegation he was having sex with his sister. The detective's testimony on direct and cross-examination differed as to whether he framed the initial allegation in the form of a statement or a question. (*Compare* Suppression Tr. 12-13 *with* Suppression Tr. 40-41.) However, in both versions, the juvenile's immediate response was to start crying. (Suppression Tr. 13, 41.)

The detective then began to talk about how he had always been honest with the juvenile; how his sister should not know about sex or have to go through anything unnecessarily; and how his parents would always love him even if they were upset, angry, or disgusted. (Suppression Tr. 13.) At that point, the detective posed the direct questions, "Did these things occur? Did you have sex with your sister?" (Suppression Tr. 13:21-23) and the juvenile responded by nodding. The detective then said, "I need a verbal." (Suppression Tr. 13:25.) The juvenile

responded verbally, "yes." (Suppression Tr. 14:2.)

All present then decided the juvenile would continue speaking with the detective alone, and the parents were escorted outside to wait. The detective then, after telling the juvenile he was still free to leave, continued questioning him, and obtained further incriminating oral and written statements.

The parties agree the detective at no point in the interview specifically advised the juvenile or his parents of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) (requiring warnings as to constitutional privilege against self-incrimination and rights to counsel prior to custodial interrogation) (applied to the juvenile setting in *In re Gault*, 387 U.S. 1 (1967)). The question posed for the court to decide was whether the detective's questioning constituted the "custodial interrogation" necessary to invoke the procedural protections of *Miranda*.

On this point, the parties presented, and the court subsequently reviewed, several decisions of the Pennsylvania Superior Court, including: *In re K.Q.M.*, 873 A.2d 752 (Pa. Super. Ct. 2005) (reversing denial of suppression on grounds juvenile's statements were taken under custodial interrogation and hence failure to administer *Miranda* warnings was fatal to interrogation); *Commonwealth v. McCarthy*, 820 A.2d 757 (Pa. Super. Ct. 2003) (affirming suppression on grounds defendant was in custody when she gave oral and written statements during interview with a policeman at a school and was not given *Miranda* warnings); *In re V.H.*, 788 A.2d 976 (Pa. Super. Ct. 2001) (reversing suppression on grounds juvenile's interview by police at his home at his parents' invitation and with them present was not custodial in nature and hence *Miranda* warnings were not required); and *In re Mellott*, 327 Pa. Super. 396, 476 A.2d 11 (1984) (reversing denial of suppression on grounds juvenile's statements made to a game warden at the scene of a hunting accident were taken under

custodial interrogation in the absence of *Miranda* warnings). The parties also submitted *Commonwealth v. Edmiston*, 535 Pa. 210, 634 A.2d 1078 (1993), *Commonwealth v. Williams*, 504 Pa. 511, 475 A.2d 1283 (1984), and *In re T.B.*, 11 A.3d 500 (Pa. Super. Ct. 2010), which were of limited relevance to our inquiry because in each of these cases *Miranda* warnings *were* given, with the question being (in *Williams* and *T.B.*, at any rate) whether a juvenile's *waiver* of *Miranda* rights was voluntary and intelligent and the extent to which parental involvement in such a waiver was necessary. As our juvenile was not given his *Miranda* rights, we have no occasion to consider whether they were voluntarily waived.

In answering the question whether our juvenile was subjected to custodial interrogation, we distill from the submitted cases the overarching principle that, "A person is deemed to be in custody for *Miranda* purposes when '[he] is physically denied of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation.'" *K.Q.M.*, 873 A.2d at 755 (quoting *Commonwealth v. Williams*, 539 Pa. 61, 74, 650 A.2d 420, 427 (1994)). "Moreover, the test for custodial interrogation does not depend upon the subjective intent of the law enforcement officer interrogator. Rather, the test focuses on whether the individual being interrogated reasonably believes his freedom of action is being restricted." *Williams*, 539 Pa. at 74, 650 A.2d at 427; *see also McCarthy*, 820 A.2d 757 (upholding suppression of oral and written statements to investigating detective by defendant not given *Miranda* warnings even though defendant had signed a waiver days earlier that she was not under arrest and that she was free to leave).

Viewing the evidence through the lens of this test, and bearing in mind that, "In all cases, the burden of production is upon the Commonwealth," Pa.R.J.C.P. 350 cmt., to establish that the juvenile's rights have not been violated in an

interrogation, *see generally Commonwealth ex rel. Butler v. Rundle*, 429 Pa. 141, 239 A.2d 426 (1968), we find as follows: 1) At the time the juvenile began to cry in response to the detective's first mention of the allegation the juvenile had had sex with his sister, he was not yet in custodial detention. Before that mention, he thought his parents had brought him to the police station to discuss with the detective the diversionary program the juvenile was in on another matter; he was seated in ease and comfort between his parents; he had been told he was free to leave; and there was no reason for him to think otherwise. 2) However, after the crying started, and the officer persisted with questioning the juvenile about whether he had had sex with his sister, and then, upon receiving his nod, insisted on a verbal response, the circumstances changed, and the illusion of freedom of action with which the interview had begun had vanished. At that point, the position the juvenile occupied between his parents was no longer one of comfort, but one of possible suspicion and accusation, and, no matter what the detective told him about being free to leave, the juvenile had to have sincere reservations about whether that was truly the case. Given the vastly different scenario that now existed from when the interview had started, the juvenile must have entertained thoughts that had he wanted or tried to leave at that point, or later after his parents had left the room and the interview continued one on one, he would not have been able to anyway, because either one or both parents would not have taken him home without his talking to the detective, and, if not, how could the juvenile exercise his purported "freedom of action" to leave? The interview had become, at that point, compulsive on the juvenile, despite the detective's contrary assurances that no longer matched the objective reality the juvenile faced. He was now between Scylla and Charybdis-either answer the detective's questions, or face the prospect that his parents, now possibly in adversarial roles as protectors primarily of their daughter in preference to him, would refuse him safe conduct home until he did. Having

been caught off guard by the initial accusation, the juvenile had no choice but to talk. He was now in a classic case of custodial interrogation, and the law required that *Miranda* warnings be administered and the *Miranda* rights voluntarily waived before the interrogation continued. Without question the officer could easily have given the juvenile his *Miranda* warnings in his parents' presence; if he, or they in consultation, decided he should exercise those rights and refuse to talk or consult an attorney, that is merely the price the constitutional requirement of "advice to rights" exacts.

"[T]he exclusion of unconstitutionally obtained evidence is not a constitutional *right*, but a constitutional *remedy*...." *Commonwealth v. Edmunds*, 526 Pa. 374, 395 n.10, 586 A.2d 887, 898 n.10 (1991). We must suppress all evidence come at by exploitation of the unconstitutional procedure as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *see also Mellott*, 327 Pa. Super. at 402, 476 A.2d at 13 ("Unless a person is advised of his *Miranda* rights prior to custodial interrogation by law enforcement officers in a criminal proceeding, evidence resulting from such interrogation cannot be used against him.").

Consequently, we *order* as follows: 1) The motion for suppression is *denied* as to the fact the juvenile started crying when the detective first raised the allegation that the juvenile had had sex with his sister, because he was not yet, at that moment, the subject of custodial interrogation, and hence the protections provided by the *Miranda* warnings did not yet apply. 2) However, the motion for suppression is *granted* as to the juvenile's responses to all the questions posed after he began to cry, including his nodding and answering yes to the officer's questions whether the juvenile had had sex with his sister and the oral and written statements he made to the detective after the juvenile's parents had left the room and the interview resumed with the detective one on one; once the actual purpose of the detective's inquiry, the sexual allegations,

surfaced abruptly, the noncustodial setting that had been established earlier disappeared, and the juvenile found himself adrift on a confusing sea of custodial interrogation in which his asserted freedom of action was no longer apparent, and the *Miranda* warnings were constitutionally required for the questioning about the sexual allegations to continue beyond that point.