J. A20012/14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| JAMES WILLIAMS, | : | No. 4 EDA 2013 |
| | : | |
| Appellant | : | |

Appeal from the Judgment of Sentence, November 9, 2012,
in the Court of Common Pleas of Philadelphia County
Criminal Division at Nos. CP-51-CR-0007513-2010,
MC-51-CR-0039412-2009

BEFORE: FORD ELLIOTT, P.J.E., MUNDY AND MUSMANNO, JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:      **FILED DECEMBER 23, 2014**

James Williams appeals from the judgment of sentence entered on November 9, 2012, in the Court of Common Pleas of Philadelphia County following his convictions of first degree murder and carrying a firearm in public in Philadelphia. Following careful review, we affirm.

**FACTUAL HISTORY**

On August 4, 2009, the police received a radio call about a shooting near 30th and Mifflin Streets in Philadelphia. Upon arrival, the police observed the body of Nathanial Nazario ("the victim") and his Cadillac, which was parked near the body. The victim sustained eight gunshot wounds. Expert testimony established that the wounds were inflicted from a distance of more than three feet. No firearm was recovered but the police found four

.9 millimeter cartridge casings that were ejected from the same firearm. Investigators were unable to determine the caliber of the bullets recovered from the decedent's body.

On the evening of his death, the victim brought a friend of the family, Jennifer Colon ("Colon"), to visit his sister, Lizette Nazario ("Lizette"), who was pregnant; Lizette lived in the Tasker Homes located at 30th and Mifflin Streets. (Notes of testimony, 11/5/12 at 7.) The victim double parked his car and went into the house. Lizette came out and talked with Colon.[1]

Soon thereafter, Markeem Williams ("Mar-Mar"), who lived around the corner, arrived and talked with Lizette's neighbor, "Butter." Exiting the house and observing Mar-Mar, the victim asked his sister if "that [was] Mar?" The victim then approached Mar-Mar and an argument began. (*Id.* at 127.) By this point, Butter had joined the conversation with Colon and Lizette. The victim directed Colon to get in the car and they left; the victim was upset and said, "we gonna straighten this shit out once and for all . . . the niggas down here are jealous and I'm tired of this shit. They calling my boy a liar." (*Id .*at 129.) Mar-Mar walked back to his porch where appellant and a group of men were waiting.

---

[1] At trial, Colon stated that she had been smoking PCP before they arrived and taking Xanax; she testified that her memory was vague as she was "drunk and high." (*Id.* at 8-9.)

Sometime thereafter, the victim and Colon drove to Kelcey Little's ("Little") house on Corlies Street, which was about four blocks away and asked Little to take a "drive." They then proceeded to the 3000 block of Mifflin Street where three men were on the porch. (*Id.* at 129.) The victim and Little got out of the car, while Colon remained inside.

The victim and Little walked up to a fence where Mar-Mar and appellant met them. (*Id.* at 15, 130.) An argument broke out, and Colon, who was nervous, exited the car to ask the victim to take her home. (*Id.* at 15, 130-131.) The victim, Colon, and Little were returning to the car when appellant walked behind them stating "come on back," trying to talk to the victim. Appellant then fired shots at the victim; Colon and Little ran. (*Id.* at 17, 131.) The victim sustained eight gunshot wounds to his back, chest, and right arm, as well as a graze gunshot wound to the back of his right shoulder. When officers arrived on the scene, in response to a radio call for a shooting, the victim was unresponsive and was pronounced dead.

After the shooting, Mar-Mar's mother called and told him and appellant that the police were there and they should not return to the area; appellant, who had been living with Mar-Mar's mother, did not return. (Notes of testimony, 11/1/12 at 194-198, 207-208.) Between 7:00 a.m. and 8:00 a.m., Detective William Holmes and other officers went to the area to conduct a neighborhood survey and try to find witnesses. (Notes of testimony, 11/2/12 at 7.) After speaking to Mar-Mar's brother, Shakir,

Detective Holmes spoke to Modesty Ligon, who lived at 3000 Mifflin Street. (**Id.** at 12.) As they spoke, a man with shoulder-length dreadlocks ran from the area behind Mar-Mar and Ligon's house, jumped a fence, got in a car, and sped away. Detective Holmes did not see his face. (**Id.** at 13-15.) Lizette testified that she did not know of any other person in the area besides appellant who wore dreadlocks down to their shoulders. (**Id.** at 124, 162.)

Colon was brought to the police station three and a half hours after the shooting and gave a statement about six hours after the shooting. (Notes of testimony, 11/5/12 at 26.) In her statement, Colon told the police that she "seen the whole thing." (**Id.** at 28.) She told the detectives that she did not know the men who shot the victim but she "got a good look at them." (**Id.**) She explained that they left Lizette's house and as they pulled away, the victim stated: "We gonna straighten this shit out once and for all . . . the niggas down here are jealous, I'm tired of this shit. They calling my boy a liar." (**Id.** at 33.)

They parked across the street from the house and three guys were standing on the porch; Colon described appellant's clothing and appearance, and that of his cohort, in great detail. Colon stated the first man she observed was heavyset, 20 to 30 years old. (**Id.** at 34.) She stated the second man, appellant, was tall, 19 to 22 years old, approximately 6 feet 2 inches tall with brown skin. (**Id.** at 34-35.) Colon told the detectives that

appellant did not have a defined beard but did have braided hair parted in the middle and down to his shoulders. (*Id.* at 35.) Appellant was wearing a white T-shirt and dark colored shorts, which were almost capri length. (*Id.*)[2] Colon described the third person, who she claimed was arguing with the victim earlier on the side of his sister's house, as approximately 6 foot and was approximately 18 to 19 years old. This man had dark skin and a short haircut; he was also wearing a white shirt and dark capris. (*Id.*)

In her statement, Colon claimed that the boy with the braids walked behind them and kept saying "come on back" to the victim. (*Id.* at 36.) "That's when the boy with the braids came out with the gun. He fired like two shots at [the victim] and then I took off." (*Id.*) She claimed that the man who initially argued with the victim was next to the shooter. (*Id.* at 40.) Colon identified the "guy who was with the guy with the braids" from a photo array. (*Id.* at 41.)[3] Four days later, the detectives showed Colon an array of eight photographs. She told the detectives that "number 7 [appellant] looks like the guy who shot [the victim] but his braids were a

---

[2] At trial, Colon stated these were not the exact answers she gave to the police. (*Id.* at 37-39.) During her direct testimony, she stated that one person had long hair and another had short hair: "I don't know if it was dreads, if it was braids. [The police] kept interrogating me if it was dreads, if it was braids. I don't know." (*Id.* at 23.) Colon also denied seeing the shooters' faces. (*Id.*)

[3] Appellant denied making this identification at trial. (*Id.* at 41.)

little longer." (*Id.* at 50.) She signed the photograph and wrote in it, "the guy who did the shooting." (*Id.* at 50-64, 137-142.)[4]

Little talked to the police he provided a statement wherein he explained the following:

> [The victim] drove off down Corlies Street to Mifflin and pulled over by the stop sign on Mifflin. He got out of the car and walked right over to the guy Mar's house who lives there. I was still in the back seat of the car. I then saw [the victim], [Mar-]Mar's friend Man-Man walking toward the side of Mar's house. I didn't know what was going on so I got out and walked back there on the side with them. [The victim] and Mar was standing there talking and Man-Man was just standing there not saying anything.
>
> The next thing I remember was the girl coming out of the car and coming over to tell [the victim] to come on. [The victim] then started walking away from where Mar and Man-Man were and that's when I heard a loud gunshot. I took off running.

Notes of testimony, 11/1/12 at 260.[5] Little told the police he did not see who fired the shots and did not see the gun, but averred that the shots came from where appellant and Mar-Mar were standing. (*Id.* at 152, 267.) When asked if he knew of any problems the victim was having with Mar-Mar

---

[4] At trial, Colon denied that she signed the photograph. She testified that when Detective Burns had her sign the page acknowledging that she had seen the photo array, the page was blank. She also testified that she did not write, "the guy who did the shooting" on the photograph. (*Id.* at 50-53, 84.)

[5] Little denied that the victim parked at Mar-Mar's house and that he ever saw Mar-Mar or appellant. (*Id.* at 265-267.)

or Man-Man, Little stated "they was jealous of him or something. [The victim] had a nice car and always had pretty girls with him." (**Id.** at 270.)[6]

In his statement, Little stated he had known Mar-Mar and appellant for approximately 4 years. He did not remember what they were wearing the night of the shooting. However, he said Mar's hair was cut close and appellant's was in dreads. (**Id.** at 273.) Little was shown photographs and identified Mar-Mar and appellant. (**Id.** at 274-276.)[7]

Mar-Mar's mother testified that she knew appellant extremely well. Upon seeing the photo of appellant, she told the police that it was an accurate description of appellant but that "[appellant's] hair is a little longer now, same style, just longer." (Notes of testimony, 11/1/12 at 213-220.)

## PROCEDURAL HISTORY

On August 12, 2009, the police obtained an arrest warrant for appellant; and on August 26, 2009, appellant turned himself in to the police. Consistent with his arrest photograph, Detective Burns stated that in August of 2009, appellant was wearing his hair in a "dreadlocked" style. No arrest warrant was issued for Mar-Mar. Appellant was charged with first degree murder, conspiracy to commit murder, several violations of the uniform firearms act, and possessing an instrument of crime.

---

[6] At trial, Little denied making this statement to detectives. (**Id.** at 270.)

[7] At trial, Little did not recall making these identifications and denied knowing Mar-Mar or appellant. (**Id.** at 275-277.)

A March 2, 2012 jury trial resulted in a hung jury. Thereafter, a jury trial commenced on November 1, 2012. The parties stipulated that appellant was not licensed to carry a firearm. On November 9, 2012, appellant was found guilty of first degree murder and carrying a firearm in public in Philadelphia; the remaining charges were **_nolle prossed_**. Appellant was sentenced to a mandatory term of life imprisonment without parole on the homicide charge and did not receive any additional sentence on the remaining charge. On November 15, 2012, appellant filed a post-sentence motion, which was denied on December 12, 2012. Appellant filed a timely notice of appeal on December 21, 2012, and raises the following issues on appeal:

> I. Under the Fifth and Fourteenth Amendments of the U.S. Constitution as well as Article I, § 9 of the Pennsylvania Constitution, did the Trial Court erroneously deny Appellant's mistrial motion where the prosecutor's opening statement improperly alleged that Appellant did not speak to the police because he knew he was "guilty" of the murder?

> II. Under the Sixth and Fourteenth Amendments of the U.S. Constitution as well as Article I, § 9 of the Pennsylvania Constitution, were Appellant's convictions supported by insufficient evidence where the prosecution failed to establish beyond a reasonable doubt that Appellant was responsible for the fatal shooting?

> III. Under the Sixth and Fourteenth Amendments of the U.S. Constitution as well as Article I, § 9 of the Pennsylvania Constitution, did the Trial Court erroneously conclude that Appellant's

convictions were not against the weight of the evidence?

IV.    Under the Sixth and Fourteenth Amendments of the U.S. Constitution as well as Article I, § 9 of the Pennsylvania Constitution, did the Trial Court erroneously deny Appellant's mistrial motion where the prosecution summation improperly (1) argued that there were "implied threats" against witnesses without any "supporting" evidence in the record; and (2) referred to defense counsel's arguments as "tactics and trickery?"

V.    Under the Sixth and Fourteenth Amendments of the U.S. Constitution as well as Article I, § 9 of the Pennsylvania Constitution, did the Trial Court erroneously permit the prosecution to bolster the testimony of a prosecution witness?

VI.    Under the Sixth and Fourteenth Amendments of the U.S. Constitution as well as Article I, § 9 of the Pennsylvania Constitution, did the Trial Court err where it provided an incomplete "circumstantial evidence" charge?

Appellant's brief at 4-5.

The first issue presented is whether the trial court erred in denying his motion for a mistrial; appellant claims the prosecution made a reference to appellant's "pre-arrest silence" in the opening statement. (Appellant's brief at 24.) After a review of the record, we agree with the Commonwealth that appellant's constitutional pre-arrest right to silence was not violated.

We review the trial court's decision to deny a mistrial for an abuse of discretion. **Commonwealth v. Boone**, 862 A.2d 639, 646 (Pa.Super. 2004). A mistrial is necessary only when "the incident upon which the

motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict." ***Commonwealth v. Parker***, 957 A.2d 311, 319 (Pa.Super. 2008), ***appeal denied***, 966 A.2d 571 (Pa. 2009).

Appellant argues that in her opening statement, the prosecutor stated that Mar-Mar's mother told appellant and Mar-Mar that the police wanted to talk to appellant and directs our attention to the following:

> And [Mar-Mar's mother] gets messages to [Mar-Mar and appellant], the cops are looking for you, and she tells them don't come around here. And guess what? They don't because they know that they're guilty and they know that they were just involved in this murder.

Notes of testimony, 11/1/12 at 48. Appellant avers "the prosecutor's commentary referred to Appellant's failure to 'talk' to homicide detectives. The prosecutor's commentary was impermissible." (Appellant's brief at 25.) Appellant relies on ***Commonwealth v. Molina***, 33 A.3d 51 (Pa.Super. 2011) (***en banc***), ***appeal granted in part***, 51 A.3d 181 (Pa. 2012), in which this court held that the defendant's pre-arrest, pre-***Miranda***[8] silence could not be used as substantive evidence of guilt at trial. In ***Molina***, the defendant refused to go to police headquarters to be interviewed by the police. ***Id.*** at 54. At closing argument, the Commonwealth argued that the defendant's refusal to cooperate with detectives should factor into the jury's

---

[8] ***Miranda v. Arizona***, 384 U.S. 436 (1966).

decision. *Id.* The *Molina* court held that the Commonwealth cannot use a non-testifying defendant's pre-arrest silence to support its contention that the defendant is guilty of the crime charged as such is an impermissible burden on the exercise of the Fifth Amendment privilege. *Id.* at 62.

We disagree with appellant's argument that the prosecutor's comment implicated his pre-arrest right to silence due to the prosecutor's use of the word "talk" and find no basis for a mistrial. Rather, we agree with the trial court that the prosecutor's remarks were concerning appellant's concealment, which is proper evidence of consciousness of guilt. *Commonwealth v. Coyle*, 203 A.2d 782, 289 (Pa. 1964). Conduct of an individual indicating consciousness of guilt is not a testimonial statement of guilt protected by the privilege against compulsory self-incrimination. *See Commonwealth v. Robinson*, 324 A.2d 441, 450 (Pa.Super. 1974) (admission into evidence of defendant's refusal to submit to breathalyzer test under implied consent law does not violate defendant's Fifth Amendment privilege against self-incrimination). For example, our courts have explained that flight, escape from custody, and the suppression of evidence are non-communicative acts unprotected by the privilege against compulsory self-incrimination. *Id*; *Commonwealth v. Collins*, 269 A.2d 882 (Pa. 1970). Thus, unlike the defendant in *Molina* who refused to be interviewed by detectives, appellant concealed his whereabouts. There is no

evidence that appellant was confronted by the police and refused to answer questions. *Cf. Molina*, *supra*.

Where evidence exists that a defendant committed a crime, knew he was wanted, and fled or concealed himself, such evidence is admissible to establish consciousness of guilt. *See Commonwealth v. Tinsley*, 350 A.2d 791, 792-793 (Pa. 1976). A defendant's knowledge may be inferred from the circumstances attendant to his flight. *See Commonwealth v. Rios*, 684 A.2d 1025, 1035 (Pa. 1996); *see also Tinsley*, 350 A.2d at 793 (concluding that such an inference was justified where the evidence revealed that the defendant abandoned his normal pattern of living without explanation and could not be located at his residence or place of employment or through contacts to his relatives). Here, there was evidence that appellant disrupted his normal pattern of living following the murder and his knowledge that he was a person of interest could be inferred from the testimony that the police informed Mar-Mar's mother that they wanted to talk to him.

Next, appellant claims that the evidence was insufficient to sustain his convictions. (Appellant's brief at 29-38.) Appellant avers that none of the Commonwealth's witnesses positively identified appellant as the shooter nor did any forensic evidence link him to the crime.

> "A claim challenging the sufficiency of the evidence is a question of law." *Commonwealth v. Weston*, 561 Pa. 199, 749 A.2d 458 (2000). "For questions of law, our scope of review is plenary."

> ***Commonwealth v. Jackson***, 592 Pa. 232, 924 A.2d
> 618 (2007). "In reviewing a sufficiency challenge, a
> court determines whether the evidence, viewed in
> the light most favorable to the verdict winner, is
> sufficient to enable the fact-finder to find every
> element of the crime beyond a reasonable doubt."
> ***Id.***

***Commonwealth v. Robinson***, 936 A.2d 107, 108 (Pa.Super. 2007),

***appeal denied***, 948 A.2d 804 (Pa. 2008).

The Commonwealth presented statements from eyewitnesses to the police that appellant had been the shooter. Testimony was presented that appellant and his cohort argued with the victim. When the victim began to walk away, appellant followed him and repeatedly urged him to come back. When the victim declined to do so, appellant repeatedly shot him in the back. The jury was free to discount appellant's theory and to credit the testimony of the witnesses who positively identified appellant as the gunman. Accordingly, we hold that sufficient evidence was presented to permit the jury to properly conclude that appellant was guilty of the first degree murder beyond a reasonable doubt.

Appellant also argues that he did not match the description of the shooter. (Appellant's brief at 32.) Appellant points to Colon's testimony that she told the police the shooter had "braided hair parted in the middle and down to his shoulders." Appellant's claim is reliant upon his assertion that there is a difference between "braided hair" and "dreadlocks." (***Id.*** at 32-33.) Appellant, however, ignores that Colon saw appellant's photograph

and identified him as the shooter. Additionally, Little testified that the shots came from where appellant and his cohort were standing. Such testimony is sufficient to establish appellant's identity.

The third issue presented is whether the trial court abused its discretion in denying appellant's weight of the evidence claim. Appellant challenges the weakness of the identifications made by Lizette, Colon, Little, and Detective Holmes. We find appellant's claims concerning Lizette and the detective to be waived as appellant failed to raise these contentions at the conclusion of trial or in his post-sentence motion. Rather, in his post-sentence motion, appellant presents the following argument:

> Here, the Commonwealth relied upon the testimony of two witnesses: Jennifer Colon and Kelcey Little. The testimony of these witnesses were [sic] against the weight of the evidence. To illustrate, Ms. Colon provided contradictory statements to the police. Furthermore, Mr. Little stated to the police in his August 6, 2009 statement to the police that he had heard shots but did not see anyone shooting. He added that he had not seen [appellant] with a gun that night. Mr. Little's testimony did not contradict Mr. Little's assertion that he had not seen [appellant] shoot the decedent.

Docket #11. Thus, we limit our review to appellant's claims concerning Colon and Little and the remaining arguments included in his brief are waived. Pa.R.A.P. 302(a); **Commonwealth v. Kane**, 10 A.3d 327, 333 (Pa.Super. 2010), **appeal denied**, 29 A.3d 796 (Pa. 2011) (no review of theory of relief distinct from one raised at trial).

Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

This does not mean that the exercise of discretion by the trial court in granting or denying a motion for a new trial based on a challenge to the weight of the evidence is unfettered. In describing the limits of a trial court's discretion, we have explained[,] [t]he term 'discretion' imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion within the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused where the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill-will.

*Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (emphasis omitted) (citations omitted).

Appellant argues that Colon's testimony was unreliable and she provided contradictory statements to the police. As stated previously, Colon gave a detailed description of appellant to the police and also admitted that

she was intoxicated.  Likewise, appellant takes issue with Little's testimony and claims that Little lied.

The jury, as fact-finder, was in the best position to evaluate the credibility and veracity of the witnesses.  Appellant's defense at trial was misidentification.  Testimony was presented that witnesses identified appellant from a photographic array.  The trial court found that when viewing the testimony of the witnesses and all of the evidence presented in conjunction with one another, the court could not find that the verdict was against the weight of the evidence.  (Trial court opinion, 6/18/13 at 13.)  In sum, the jury's verdict did not shock the trial court's sense of justice and was amply supported by credible evidence.  No relief is due.

The fourth issue before this court is whether the trial court erroneously denied appellant's motion for a mistrial in response to the prosecutor's summation.  Appellant alleges that the prosecutor improperly argued that "implied threats" existed without evidence to support such a statement and improperly referred to the arguments of defense counsel as "tactics and trickery."  After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the trial court, it is our determination that there is no merit to this issue.  The trial court's opinion comprehensively discussed and properly disposes of this matter and,

accordingly, we adopt that opinion as our own and affirm on that basis.[9] (**Id.** at 6-8.)

In the fifth issue presented, appellant argues Lizette's testimony that she was telling the truth was improper bolstering by the prosecutor. (Appellant's brief at 49-54.) We agree with the Commonwealth that appellant's claim is waived and, even if preserved, meritless.

Appellant's argument centers on the prosecutor's question to Lizette, "are you telling the truth?" to which she answered "Yes, I am." (Notes of testimony, 11/2/12 at 160.) Our review of the notes of testimony indicates that appellant did not object when the prosecutor asked this question to Lizette. (**Id.**) While the defense did object to two other questions that pertained to the cross-examination of this witness, the witness did not answer either question as the first objection was sustained and a side-bar was held following the second objection. Appellant did not pose an objection during the prosecutor's questioning of Lizette on the basis of improper bolstering. Therefore, this issue has been waived. **See** Pa.R.A.P. 302(a); **Commonwealth v. Rivera**, 983 A.2d 1211, 1229 (Pa. 2009) ("This Court has held that the lack of a contemporaneous objection constitutes a waiver of any challenge to the prosecutor's closing remarks.").

---

[9] Additionally, we note the trial court's cautionary instruction was sufficient to overcome any potential prejudice that may have resulted. It is well settled that a jury is presumed to follow the instructions of the court. **Commonwealth v. Natividad**, 938 A.2d 310, 326 n.9 (Pa. 2007).

Moreover, had appellant preserved his claim, no relief would be due. The Pennsylvania Supreme Court has stated that "[i]mproper bolstering or vouching for a government witness occurs where the prosecutor assures the jury that the witness is credible, and such assurance is based on either the prosecutor's personal knowledge or other information not contained in the record." **Commonwealth v. Smith**, 995 A.2d 1143, 1157 (Pa. 2010). Here, the prosecutor elicited the basis for the witness' frustrated demeanor on cross-examination, and the witness asserted she was not lying. The prosecutor did not offer her personal opinion about Lizette's veracity, nor did the Commonwealth indicate that evidence not before the jury supported the testimony. As the court stated in **Commonwealth v. Stokes**, 38 A.3d 846, 867 (Pa.Super. 2011), "A witness's own personal assurance that he would not lie. . . . is not impermissible bolstering, as the jury must nevertheless decide if the witness himself is being truthful."

The last issue before this court is whether the trial court erred in instructing the jury on circumstantial evidence. Appellant argues the court did not state that before the jury could draw inferences from facts, they must first conclude those facts are true. (Appellant's brief at 54-55.)

We begin by noting that counsel is not entitled to the jury instruction of his choice. **Commonwealth v. Ohle**, 470 A.2d 61 (Pa. 1983). The wording of an instruction is vested in the broad discretion of the trial judge and is proper as long as it is adequate, accurate, and clear. **Id.** at 70.

Upon examination of the charge as a whole, we find it was fair and proper. The trial court's opinion comprehensively discussed and properly disposes of this matter and, accordingly, we adopt that portion of its opinion as our own and affirm on that basis.[10] (Trial court opinion, 7/18/13 at 16.)

We deny the Commonwealth's petition for permission to file a response to appellant's reply brief as it is unnecessary. Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/23/2014

---

[10] Again, it is well settled that a jury is presumed to follow the instructions of the court. **Natividad**, **supra**.

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
TRIAL DIVISION – CRIMINAL SECTION

COMMONWEALTH OF PENNSYLVANIA :
:
v. : CP-51-CR-0007513-2010
:
JAMES WILLIAMS : **FILED**

JUN 1 8 2013

Criminal Appeals Unit
First Judicial District of PA

OPINION

CARPENTER, J. June 18, 2013

Defendant James Williams ("Williams") was charged with and found guilty of Murder of the First Degree (H1) and Carrying Firearms in Public in Philadelphia (M1) on bill of information CP-51-CR-0007513-2010. These charges arose from the shooting death of Nathaniel Nazario on August 4, 2009 near the intersection of New Hope Street and Mifflin Street in the City and County of Philadelphia. This court requests that the Superior Court uphold the convictions and affirm the sentence imposed in this matter.

PROCEDURAL HISTORY

On November 1, 2012, Williams elected to exercise his right to a jury trial and pled not guilty to the above listed charges. On November 5, 2012, this court denied Williams' Motion for Judgment of Acquittal at the close of the Commonwealth's case. On November 9, 2012, the jury found Williams guilty of First Degree Murder (H1) and Carrying Firearms in Public in Philadelphia (M1). At the conclusion of the trial, this court

sentenced Williams to the mandatory term of Life imprisonment without parole on the homicide charge and did not impose any additional sentence on the remaining charge. On November 15, 2012, Williams filed a Post-Sentence Motion, which this court denied on December 12, 2012.

On December 21, 2012, this court received a Notice of Appeal and on February 7, 2013, upon completion of the notes of testimony, Williams was served an Order directing him to file a concise statement of the matters complained on appeal pursuant to Pa.R.A.P.1925(b). On February 14, 2013, this granted Williams' Motion for Extension of Time to File a 1925(b) Statement. On March 1, 2013, this court received Williams' 1925(b) response which raised the following issues on appeal:

1. In violation of Appellant's right against self-incrimination under the Fifth and Fourteenth Amendments of the U.S. Constitution as well as Article I, § 9 of the Pennsylvania Constitution, [this] court denied Appellant's timely motion for a mistrial where the prosecutor's opening statement remarked that Appellant and his alleged co-conspirator did not speak to the police because "they know that they're guilty and they know that they were just involved in this murder." (N.T. 11/1/12 at 48-49, 54-68).

2. In violation of Appellant's due process rights under the Sixth and Fourteenth Amendments of the U.S. Constitution as well as Article I, § 9 of the Pennsylvania Constitution, [this] court denied Appellant's timely requests for a mistrial where the prosecution summation improperly (1) argued that there were "implied threats" against witnesses where there was no evidence in the record concerning "implied threats"; (2) referred to Appellant's arguments as "tactics and trickery"; and (3) used Powerpoint to visually reinforce every point in the prosecution summation. (N.T. 11/7/12 at 81-82, 121-22). The cautionary instructions that [this] court provided concerning the "implied threats" did not sufficiently cure the unfair prejudice resulting from the prosecution's comments. (N.T. 11/7/12 at 151-52).

3. In violation of Appellant's due process rights under the Sixth and Fourteenth Amendments of the U.S. Constitution as well as Article I, § 9 of the Pennsylvania Constitution, Appellant's convictions were supported by insufficient evidence where (1) no Commonwealth witness made a positive identification of Appellant as the shooter; and

(2) no forensic evidence (e.g. ballistics) linked Appellant to the fatal shooting.

4. In violation of Appellant's due process rights under the Sixth and Fourteenth Amendments of the U.S. Constitution as well as Article I, § 9 of the Pennsylvania Constitution, Appellant's convictions were against the weight of the evidence where all of the Commonwealth witnesses (1) were not present at the homicide; (2) at the time of the homicide were under the influence of controlled substances which impaired their ability to accurately observe and recall events; and/or (3) gave multiple inconsistent statements.

5. In violation of Appellant's due process rights under the Sixth and Fourteenth Amendments of the U.S. Constitution as well as Article I, § 9 of the Pennsylvania Constitution, [this] court overruled Appellant's timely objection to the Commonwealth's bolstering where the Commonwealth asked its witness, "Can you explain what it is about the way [Appellant's counsel] asks you questions that is so frustrating." (N.T. 11/2/12 at 159-60).

6. In violation of Appellant's due process rights under the Sixth and Fourteenth Amendments of the U.S. Constitution as well as Article I, § 9 of the Pennsylvania Constitution, [this] court overruled Appellant's timely objection to [this] court's jury instructions that failed to make it sufficiently clear that (1) the Commonwealth must prove all of the elements of the charged offense; and (2) before the jurors may draw inferences from facts (e.g. circumstantial evidence), the jurors must first conclude that these facts are true. (N.T. 11/7/12 at 139-143, 180).

## FACTS

Late in the evening on August 4, 2009, the victim, Nathaniel Nazario ("Nazario") brought a friend of the family, Jennifer Colon ("Colon"), to visit Nazario's sister, Lizzette, at their mother's house on New Hope Street, which is "catty corner" from Mifflin Street. Soon thereafter, Markeem Williams ("Mar" or "Markeem") walked from his house on Mifflin Street toward New Hope Street and started having a conversation with the Nazarios's next door neighbor. While talking with the neighbor, Markeem was on his cell phone with defendant James Williams ("Man-Man"), who was on the porch of

3

Markeem's house on Mifflin Street. During the time that Markeem was talking with the neighbor on New Hope Street, Nazario joined the conversation. For a few moments, the neighbor, Markeem and Nazario were conversing and then the neighbor walked away. Things between Nazario and Markeem became heated. Throughout the conversation, Markeem remained on his cell phone with defendant Man-Man, who continued to stand on Markeem's porch on Mifflin Street. Eventually, Markeem and Nazario ended their conversation. Markeem walked back toward his house and Nazario and Colon drove away.

Sometime thereafter, Nazario and Colon drove to Kelcey Little's ("Little") house on Corlies Street, which was about four blocks from the intersection of New Hope and Mifflin Street and asked Little to take a "drive." The three then proceeded to the 3000 block of Mifflin Street. Nazario and Little got out of the car, while Colon remained inside. Nazario and Little walked up to a fence where Markeem and Man-Man met them. An argument broke out, and Colon exited the car to ask Nazario for a cigarette and to take her home. Nazario, Colon, and Little were returning to the car when Man-Man shot Nazario. Nazario sustained eight gunshot wounds to his back, chest, and right arm, as well as a graze gunshot wound to the back of his right shoulder. When officers arrived on scene, in response to a radio call for a shooting, Nazario was unresponsive and he was pronounced dead.

4

## DISCUSSION

### *Denial of Motion for a Mistrial*

Generally, comments by a prosecutor do not constitute reversible error unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict.[1] The decision to grant a mistrial is within the discretion of the trial judge, who is in the best position to determine the effect of the prosecutor's remark on the jury.[2] In evaluating whether such remark constituted prosecutorial misconduct, thus warranting the grant of a mistrial, the trial court shall employ a harmless error standard.[3] The trial court's decision to deny a request for a mistrial will not be reversed except for an abuse of discretion.[4]

### A. Prosecutor's Opening Statement

On appeal, Williams claims that this court erred in denying his motion for a mistrial when the prosecutor remarked in her opening statement that he and his alleged co-conspirator did not speak to the police because "they know that they're guilty and they know that they were just involved in this murder."[5] This court disagrees. The courts of this Commonwealth have long held that when a person commits a crime, knows that he is wanted, and subsequently conceals himself, such conduct is proper evidence of consciousness of guilt.[6] The prosecutor's statement at issue in the instant

---

[1] *Com. v. Simmons*, 662 A.2d 621, 639 (Pa. 1995).
[2] *Com. v. Brown*, 711 A.2d 444, 454-55 (Pa. 1998).
[3] *Com. v. Judy*, 978 A.2d 1015, 1020 (Pa. Super. Ct. 2009).
[4] *Id.*
[5] N.T. 11/1/12 at 48:20-22..
[6] *Com. v. Coyle*, 203 A.2d 782, 789 (1964).

appeal was made in the context of her argument that the evidence to be presented at trial would demonstrate the defendant's consciousness of guilt. Such argument was properly made and did not prejudice the jury such that the jury was precluded from weighing the evidence objectively and rendering a true verdict; therefore, Williams' assertion that this court erred in denying his motion for a mistrial must fail.

### B. Prosecutor's Summation

Similarly, Williams claims that this court erred in denying his motion for a mistrial during closing arguments when the prosecutor argued that there were "implied threats" against witnesses, referred to Williams' arguments as "tactics and trickery", and used PowerPoint slides to visually reinforce every point in her summation. This court disagrees. A prosecutor has reasonable latitude during closing argument to advocate the Commonwealth's case, respond to arguments of opposing counsel, and fairly present the Commonwealth's version of the evidence to the jury.[7] A prosecutor's arguments are fair if they are supported by the evidence or use inferences that can reasonably be derived from the evidence.[8]

With regard to the "implied threats" at issue in the instant matter, the prosecutor's statements about the culture of the city and the difficult situation faced by witnesses in criminal cases were made in an effort to explain the concept of witnesses "going south". These statements offered a fair explanation of the testimony presented to the jury and were a fair response to the defense's closing remarks that made alternative implications of the witnesses' testimony. Defense counsel stated "You've heard a lot of testimony,

---

[7] *Com. v. Cooper*, 941 A.2d 655, 668 (Pa. 2007).
[8] *Com. v. Judy*, 978 A.2d 1015, 1020 (Pa. Super. Ct. 2009).

people getting on the stand under oath, sworn to tell the truth, calling on a higher authority than what's in this courtroom to help them be straight up and honest. Have you heard that from the so called eyewitnesses in this case?"[9] These remarks implored the jury to view the evidence in one manner, while the prosecutor's arguments offered a different perspective. Most importantly, however, the prosecutor explicitly told the jury that "there's no evidence in this case that the defendant or anyone on behalf of the defendant specifically threatened any of these witnesses[.]"[10] Moreover, this court provided the jury with the following cautionary instruction:

> And I think that in the course of arguments there may have been mention to you about whether, you know, the culture on the street, about why people do or don't come to court. Remember, ... it's your common sense and human experience that evaluates why someone came to court and what their testimony was and did you think that they were scared or not scared. But I'm going to tell you, there was no evidence whatsoever in this case and I'm telling you there is no evidence that anyone was threatened in this case by the defendant or anybody that's associated in any way with the defendant. Okay? ...It might have been implied to you that that could have been a situation. You cannot in any way assume or imply or think that somehow anyone was threatened by anybody associated with this case. Do you understand that? All right.[11]

In consideration of the context of the prosecutor's remarks and this court's cautionary instruction, this court found that the jury was not prejudiced, so as to be unable to render a true verdict.[12]

With regard to the prosecutor's reference to defense counsel's "tricks and tactics"[13], this court found Williams' claim similarly unmeritorious. This remark was made in response to the defense's comments during opening and closing statements

---

[9] N.T. 11/7/2012 at 48:3-9.
[10] N.T. 11/7/2012 at 81:17-20.
[11] N.T. 11/7/2012 at 151:16-25; 152:2-11.
[12] *Com. v. Reed*, 583 A.2d 459, 470 (Pa. Super. 1990).
[13] N.T. 11/7/2012 at 77:11-13.

that referred to the prosecutor as a magician[14] and described her as using her "little tweezers"[15] to pick information out of a statement. Thus, in the context of the trial, the prosecutor's closing remarks were a fair response to the defense's earlier commentary and did not prejudice the jury.

Finally, with regard to the prosecutor's use of PowerPoint slides during her closing remarks, this court found Williams' claim unmeritorious. The content of the slides was proper for the jury to see and merely provided a roadmap of the prosecutor's summation of the case. Moreover, defense counsel made extensive mention to the anticipated PowerPoint presentation during his own closing remarks, by commenting on the various things that such presentation *would not* show.[16] Thus, the slides were properly criticized by the defense in his closing remarks and properly shown by the prosecutor during her closing remarks, such that the jury was not prejudiced by the visual reinforcement of the slides.

### Sufficiency of the Evidence

The standard applied when reviewing the sufficiency of evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime

---

[14] N.T. 11/1/2012 at 74:3-16. Defense counsel stated the following during his opening statement: You know, I look around. We're in a courtroom. These four walls enclose a courtroom, not a magic show, the kind of a magic show from Miss Donnelly, who is an outstanding advocate for the Commonwealth of Pennsylvania and an outstanding prosecutor and a clever prosecutor, but I didn't know we were in a magic show. I thought we were in a courtroom where the case is decided by actual evidence that comes from witnesses testifying on the witness stand, and it seems like it's the kind of a magic show where you actually get to see the magician put the rabbit into the hat before she takes it out of the hat. *Id.*

[15] N.T. 11/7/2012 at 57:5-12.

[16] N.T. 11/7/2012 at 50:22-25; 51:2-25; 52:2-10.

8

beyond a reasonable doubt.[17] In applying this test, the Superior Court may not weigh the evidence and substitute its judgment for that of the fact-finder. The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless, the evidence is so weak and inconclusive that as a matter of law, no probability of fact may be drawn from the combined circumstance.[18] The Commonwealth may satisfy its burden of proving an element of the crime beyond a reasonable doubt through the use of wholly circumstantial evidence. In applying the test, the whole record must be evaluated and all evidence received must be considered.[19]

On appeal, Williams asserts that the evidence was insufficient to support his convictions because no Commonwealth witness positively identified him as the shooter nor did any forensic evidence link him to the fatal shooting. This court disagrees. The evidence presented at trial established that both Jennifer Colon and Kelcey Little were present at the time of the shooting and both individuals gave statements to police. Colon's statement indicated that she was present at the time of the shooting, as per her response "Yes. I was right there. I seen the whole thing."[20] It also provided the following description of what had happened immediately prior to the shooting:

> Then we just all started walking back to the car. Me and Nate were
> together and the other boy that we picked up was just ahead of us. As we
> got back to the car, the boy with the braids was walking right behind us
> and kept saying, 'Come on back,' trying to talk to Nate. Nate just said,
> 'We're gonna leave it at that, ain't no more to say.' That's when the boy
> with the braids came out with the gun. He fired like two shots at Nate and

---

[17] *Com. v. Heberling*, 678 A.2d 794, 795 (Pa. Super. 1996) (citing *Com. v. Williams*, 650 A.2d 420 (Pa. 1994)).
[18] *Com. v. Cassidy*, 668 A.2d 1143, 1144 (Pa. Super. 1995).
[19] *Com. v. Valette*, 613 A.2d 548, 549 (Pa. 1992).
[20] N.T. 11/5/2012 at 125:19-20.

9

then I took off. There may have been more shots as I was running but I'm not sure. I just kept running.[21]

Colon was able to identify a photo of Mar as "the guy that Nate was arguing with outside his sister's house[,] [t]he same guy that was with the boy in the braids when he shot Nate"[22] and a photo of Man-Man that she labeled as "the guy who did the shooting."[23] Similarly, Little's statement indicated that he was present at the time of the shooting, as per his response "Yes. I was there. I ran as soon as I heard the first shot."[24] It also provided that the shots "came from right where Mar and Man-Man were"[25] and when asked to describe Mar and Man-Man's hairstyles he indicated that "Mar has a close cut and Man-Man's hair is in dreads."[26] Little then identified photos of both Mar and Man-Man, by those names, to police.

Although, at trial, Colon and Little disavowed many of the averments made in their respective statements to police, their signed statements were properly admitted as evidence at trial through the testimony of Detective Burns. Each of the statements was admissible for its truth as a prior inconsistent statement that was signed and adopted by the declarant.[27] Moreover, the Pennsylvania Supreme Court has held that where a witness at trial recants a statement he previously made to police, the jury is "free to evaluate both the [witness's] statement to police as well as his testimony at trial recanting that statement, and [is] free to believe all, part, or none of the evidence."[28] The Court specified that "the mere fact that [an eyewitness] recanted a statement he

---

[21] N.T. 11/5/2012 at 131:17-25; 132:2-5.

[22] N.T. 11/5/2012 at 133:14-16.

[23] N.T. 11/5/2012 at 142:20-24.

[24] N.T. 11/5/2012 at 141:21-22.

[25] N.T. 11/5/2012 at 152:14-15.

[26] N.T. 11/5/2012 at 155:3-4.

[27] See Pa.R.E. 803.1(1)(b).

[28] Com. v. Hanible, 836 A.2d 36, 39 (Pa. 2003).

had previously made to the police certainly does not render the evidence insufficient to support [the] conviction."[29] Further, a reviewing court must consider any prior inconsistent statements, properly admitted under Pa.R.E 803.1(1), in the same manner as any other type of validly admitted evidence when determining if sufficient evidence exists to sustain a criminal conviction.[30]

In addition to the facts established by the eyewitnesses, Colon and Little, the other evidence presented at trial included the four fired cartridge casings, all from the same nine-millimeter gun, that were found at the scene as well as the statements and testimony of Lizette Nazario and Elissa Barber. At the time of the shooting, Elissa and Lizette were in nearby houses and heard the gunshots. Lizette gave a statement to police detailing the events leading up to the shooting and identified a photo of Mar; although she did not identify Man-Man to police, she did identify Man-Man in court as one of the guys who was standing on the porch at 3002 Mifflin Street.[31] Elissa's statement and testimony further corroborated that of the other witnesses', by confirming that gunshots rang out close to her home at 3002 Mifflin Street, that Mar and Man-Man were friends, and that Mar and Man-Man were at her house on the night of the shooting, but that they were out when the shooting occurred.[32] This court, in viewing all the evidence admitted at trial in the light most favorable to the Commonwealth, has determined that the evidence was sufficient to enable the jury to find, beyond a reasonable doubt, that Williams was the individual who shot Nathaniel Nazario.

---

[29] Id.
[30] Com. v. Brown, 52 A.3d 1139, 1171 (Pa. 2012).
[31] N.T. 11/2/2012 at 105-107.
[32] N.T. 11/1/2012 at 189-195.

*Weight of the Evidence*

The standard of review for a challenge to the weight of evidence is well settled in Pennsylvania. The fact finder is the exclusive judge of the weight of evidence, is free to believe all, part, or none of the evidence presented, and determines the credibility of the witnesses.[33] An appellate court cannot substitute its judgment for that of the fact finder.[34] A verdict will be reversed and a new trial granted only where the verdict is so contrary to the evidence as to "shock one's sense of justice."[35] A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have come to another conclusion.[36] Pennsylvania appellate courts have repeatedly emphasized that "[o]ne of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence."[37]

On appeal, Williams asserts that his convictions were against the weight of the evidence because the Commonwealth witnesses were not present at the time of the killing, they were under the influence of controlled substances at the time of the killing, and they gave multiple inconsistent statements. This court disagrees. As discussed at length above, the jury heard testimony from eyewitnesses Colon and Little as well as testimony from Lizette and Elissa, who were in the neighborhood. In analyzing whether the jury verdict is against the weight of the evidence, this court cannot isolate the

---

[33] *Com. v. Champney*, 832 A.2d 403, 408 (Pa. 2004).
[34] *Id.*
[35] *Com. v. Passmore*, 857 A.2d 697, 708 (Pa. Super. 2004), *appeal denied*, 868 A.2d 1199 (Pa. 2005).
[36] *Thompson v. City of Philadelphia*, 493 A.2d 669, 673 (Pa. 1985).
[37] *See Com. v. Forbes*, 867 A.2d 1268, 1273 (Pa. Super. 2005); *See also Com v. Brown*, 648 A.2d 1177 (Pa. 1994).

testimony of these witnesses from one another or from other evidence, as the determination requires an assessment of *all* evidence presented at trial. Individually, the statements and photo identifications given by each witness may appear to want for more descriptive details; however, when viewed in conjunction with one another, in the context of the entire trial, the similarities between the descriptions and how they corroborate one another are significant. While a conviction based upon any one of these witnesses' testimony, alone, *may* have been against the weight of the evidence, it does not mandate a finding that, viewing the testimony as a whole in the context of all other evidence admitted at trial, the verdict is against the weight of the evidence. Further, the jury was free to evaluate the various inconsistencies in the witnesses' statements and was free to evaluate the evidence related to witness use of controlled substances in its assessment of the weight of the evidence presented at trial. The jury verdict, reflecting such assessment, was not so contrary to the evidence presented at trial as to "shock one's sense of justice." Therefore, this court finds no merit in Williams' challenge to the weight of the evidence presented at trial.

*Overruling of Objection to Commonwealth Bolstering*

It is well settled in the Pennsylvania courts that as long as a prosecutor does not assert personal opinions, he or she may, within reasonable limits, comment on the credibility of a Commonwealth witness.[38] Our Supreme Court has opined that this is especially true when the credibility of the witness has been previously attacked by the defense.[39] Such commentary is proper because the prosecutor is permitted to respond

---

[38] *Com. v. Simmons*, 662 A.2d 621, 639 (Pa. 1995).
[39] *Id.*

13

to the arguments of the defense and "is free to present his or her case with logical force and vigor."[40] A prosecutor, however, must be cognizant to abstain from improper commentary on a witness' credibility via his own statements or via the elicitation of improper comments from a Commonwealth witness.[41]

In the instant appeal, Williams avers that this court improperly overruled his objection to bolstering when the Commonwealth asked its witness, "Can you explain what it is about the way [defense counsel] asks you questions that's so frustrating?" This court overruled the objection because the prosecutor was properly questioning her witness, in the course of redirect examination, to clarify for the jury why the witness expressed such frustration during cross-examination. Defense counsel had properly cross-examined the witness on the details of what she had observed and what she had reported, seeking "yes" or "no" responses, thereby highlighting inconsistencies and/or omissions in an effort to attack her overall credibility as a witness. As a result, the witness became frustrated in her responses. Thus, on redirect examination, the prosecutor was free to respond to the attack on the witness' credibility by questioning the witness as to why she had become frustrated in her responses and giving the witness the opportunity to clarify any testimony that may have appeared confusing on cross-examination.

## Overruling of Objection to Jury Instructions

A trial court has broad discretion in phrasing its instructions to the jury and may choose its own wording, provided that the law is clearly, adequately, and accurately

---

[40] *Com. v. Tedford*, 691, 960 A.2d 1, 31-32 (Pa. 2008) (citing *Com. v. Koehler*, 737 A.2d 225, 240 (Pa. 1999)).
[41] *Id.*

presented to the jury.[42] A trial court's instructions will constitute reversible error only where there is an abuse of discretion or an inaccurate statement of the law.[43] When assessing a challenge to the trial court's instructions, a reviewing court must review the charge as whole, not merely isolated fragments, to determine if it is fair and complete.[44]

### A. Commonwealth's Burden of Proof Beyond a Reasonable Doubt

On appeal, Williams asserts that this court erroneously overruled his objections to this court's instructions to the jury. Williams claims that the instructions failed to make it sufficiently clear that the Commonwealth must prove all of the elements of the charged offense. This claim is without merit and is unsupported by the record. With regard to the Commonwealth's burden of proof, this court explained numerous times throughout the jury charge that each element of the crimes charged must be proven with evidence beyond a reasonable doubt.[45] Moreover, the jury received instruction on each of the crimes charged, stressing that the elements of the charge must be proven beyond a reasonable doubt.[46] The jury also received the written elements with them during jury deliberations, which also stressed that each element must be proven beyond a reasonable doubt. Taking all of these instructions into consideration, this court found that its charge to the jury made it abundantly clear that the Commonwealth bore the burden of establishing each element of each offense with proof beyond a reasonable doubt.

---

[42] *Com. v. Hawkins*, 701 A.2d 492, 511 (Pa. 1997).
[43] *Id.*
[44] *Com. v. Cook*, 952 A.2d 594, 626-27 (Pa. 2008); *Com. v. Hawkins*, 701 A.2d 492, 511 (Pa. 1997).
[45] N.T. 11/7/2012 at 135:2-15; 137:23-25; 138:2-18.
[46] N.T.11/7/2012 at157:9-13; 167 4-17; 170 4-11; 171:9-11; 172: 13-16.

### B. Circumstantial Evidence

Similarly, Williams claims that this court's instructions on circumstantial evidence were not sufficiently clear because this court did not specifically charge that "before jurors may draw inferences from facts, the jurors must first conclude those facts are true." This claim is also without merit when the charge is read as a whole. This court charged the jury to use their common sense and good judgment.[47] This court then instructed the jury that "before you can infer a fact, you must consider all of the evidence in light of reason, experience and common sense and the other instructions that I will be giving to you and have given to you about what it means on the credibility of testimony."[48] Also, when instructing the jury on assessing credibility, this court instructed the jurors that "you must decide credibility and weight of all testimony, and that means you must decide whether you believe the testimony and how important you think it is."[49] In consideration of all of these various portions of the charge, the jury had ample instruction on how to weigh and assess the evidence, both direct and circumstantial evidence.

## CONCLUSION

For the reasons set forth in this Opinion, the Superior Court should affirm the jury's finding of guilt and the sentence imposed in this matter.

_____
Carpenter, J.

---

[47] N.T.11/7/2012 at139-140.
[48] N.T.11/7/2012 at141-142.
[49] N.T.11/7/2012 at142-143.

16