J. A18029/16

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA,   :     IN THE SUPERIOR COURT OF
                                     :            PENNSYLVANIA
              Appellant      :
                                       :
              v.             :           No. 2062 MDA 2015
                                       :

CODY RYAN RIGG              : 

Appeal from the Order Entered November 18, 2015,
in the Court of Common Pleas of Berks County
Criminal Division at No. CP-06-CR-0004374-2014

BEFORE: FORD ELLIOTT, P.J.E., BENDER, P.J.E., AND STEVENS,* P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:      **FILED FEBRUARY 09, 2017**

The Commonwealth appeals from the order entered November 18, 2015, granting defendant/appellee Cody Ryan Rigg's ("Rigg") motion to suppress statements. After careful review, we affirm.

The trial court has summarized the history of this case as follows:

> On July 7, 2014, Detective Michael Fick, with the Berks County District Attorney's Office, assisted with an investigation of child abuse. He was asked if he would interview, along with Detective [Christopher] Santoro, one Cody Rigg (Defendant) in an interview room in the Detective's Unit on the 15th floor of the Services Center in Reading, Berks County, Pennsylvania. Detective Fick initially went over basic information with [Rigg]. The detective began a time line to talk to [Rigg] about what had happened to an 11 month old girl named [J.F.], who was injured somehow. The interview began around 10:15 am with a break around 11:50 am. [Rigg]

_____

* Former Justice specially assigned to the Superior Court.

asked to record the interview on his phone. The detective asked for a copy of the recording; [Rigg] agreed to this. [Rigg] left the room to use the restroom and was asked to wait in the lobby from where he would be retrieved after Detective Fick consulted with Sergeant [Harold] Shenk. The interviewing continued until 1225 hours and [Rigg] was given crackers and water. Detective Fink [sic] then advised [Rigg] that they had with [sic] other detectives who were doing other interviews and that his story was not matching up. At approximately 1250 hours, [Rigg] admitted that he caused the injuries to [J.F.]. [Rigg] then wrote and signed his three page statement (Notes of Testimony, 4/16/15, pp. 21-30).

[Rigg] was charged by Criminal Information with three counts of Aggravated Assault, in violation of 18 Pa.C.S.A. § 2702(a)(1), all felonies. On November 3, 2014, [Rigg], through his attorney, filed an Omnibus Pre[-]Trial Motion. The hearing was held on January 22, 2015; April 16, 2015 and concluded on June 29, 2015. [Rigg]'s Motion to Suppress Statements was granted on November 18, 2015. On November 25, 2015, the Commonwealth filed a Notice of Appeal to the Superior Court, certifying that this ruling terminated or substantially handicapped the prosecution of this case.[1] In its Concise Statement of Errors Complained of on Appeal,[2] the Commonwealth asserts that "the trial court erred in suppressing statements pursuant to **Miranda**[3] made during a non-custodial interview where the defendant was told he was free to leave."

Trial court opinion, 2/3/16 at 1-2; Docket #42.

---

[1] Pa.R.A.P. 311(d); **Commonwealth v. Dugger**, 486 A.2d 382 (Pa. 1985).

[2] Pa.R.A.P. 1925(b).

[3] **Miranda v. Arizona**, 384 U.S. 436 (1966).

The trial court, after several evidentiary hearings on Rigg's suppression motion, made the following findings of fact:

1. On July 4th, 2014, Berks County Children & Youth Service (CYS) received a report of an alleged child abuse victim. The victim was a ten (10) month old female (J.F.). The victim was treated at the Reading Hospital and then transported to Hershey Medical Center. The victim suffered from a brain bleed, bruises on her face/chin area and bruises on her neck and ears.

2. During the investigation Detective Harold Shenk and Officer Matthew F. Harley met with a CYS case worker Pat Murray to locate possible suspects. The Defendant (Cody Rigg) was mentioned as a possible suspect.

3. On July 5th Sergeant Matthew F. Harely [sic] interviewed [Rigg] at Hershey Medical Center and no incriminating statements were made. Subsequently on the same day, Sergeant Vega also interviewed [Rigg] at his residence and no incriminating statements were made.

4. Sergeant Vega scheduled an interview appointment with [Rigg] for July 7th, 2014 at the Berks County Services Center. [Rigg] appeared [at] approximately 10:00 a.m. on said date. Detective Fick escorted [Rigg] to the front interview room on the 15th floor. Detective Fick started to ask basic questions (name, date of birth, address).

5. [Rigg] requested that the interview be recorded on his cell phone. Detective Fick permitted this and requested a copy of the recording. [Rigg] agreed and the questioning commenced.

6. Detective Fick informed [Rigg] that he was not under arrest and he can leave at any time. He

advised [Rigg] that he would be going home "no matter" what he said. The Detectives also handed [Rigg] a "Notification of Non-Arrest" form. [Rigg] signed the form at approximately 10:15 a.m. The Detectives at this point had narrowed their forms [sic] to [Rigg] alone. Hence they used all of the tactics at their disposal to coerce a statement from [Rigg].

7. During the interview the Detective asked [Rigg] what happened to J.F. [Rigg] explained the events that transpired and said his two (2) year old daughter previously kicked J.F. in the face and ultimately [Rigg] said he does not know exactly what happened to J.F. She was just not her normal self and unresponsive. [Rigg] brought the issue to the birth mother and she called the paramedics.

8. [Rigg] received a break at approximately 11:50 a.m. The interview resumed at approximately 12:00 p.m. Detectives Fick and Santoro continued to ask the same questions repeatedly to [Rigg]. [Rigg] consistently denied knowing how J.F. sustained her injuries. The Detectives used multiple aggressive tactics (profanity, indirect threat[s], lies about witnesses' statements, etc.) during questioning and [it] lasted for several hours.

9. Subsequently, after approximately several hours of intense questioning, [Rigg] confessed and stated he caused injury to J.F. by shaking her and was convinced to write a three (3) page statement about his actions. [Rigg] was further directed into another room to visually record his statements. [Rigg] was arrested and charged with three (3) counts of Aggravated Assault and one (1) count of Endangering Welfare of Children.

10. There was a pre-meditated attempt on the part of the police interviewers to take advantage of

> [Rigg]'s lack of mental capacity to extract incriminating statements.
>
> 11. The statements of [Rigg] were the product of custodial interrogation. In spite of statements that [Rigg] was free to leave at any time, this court is convinced that those statements were false and misleading.
>
> 12. There is no reason, whatsoever, in the circumstances of this interrogation why the police chose not to give [Rigg] his *Miranda* warnings.
>
> 13. The statements of [Rigg] were involuntary.

"Findings of fact and conclusions of law pursuant to Pa.R.Crim.P. 581(I),"

11/18/15 at 1-2; Docket #29 (emphasis added).

The Commonwealth has raised the following issues for this court's review:

> A. Did the trial court err in suppressing statements obtained as a result of a non-custodial interview?
>
> B. Did the trial court err in suppressing statements that were voluntarily made?

Commonwealth's brief at 4 (capitalization deleted).

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty it

is to determine if the suppression court properly applied the law to the facts.

***Commonwealth v. Nester***, 709 A.2d 879, 880-881 (Pa. 1998) (citations omitted).  "The determination of whether a confession is voluntary is a conclusion of law and, as such, is subject to plenary review." ***Commonwealth v. Templin***, 795 A.2d 959, 961 (Pa. 2002), citing ***Nester***, ***supra***.

> Statements made during custodial interrogation are presumptively involuntary, unless the accused is first advised of . . . ***Miranda*** rights.  ***Commonwealth v. DiStefano***, 782 A.2d 574, 579 (Pa.Super. 2001), ***appeal denied***, 569 Pa. 716, 806 A.2d 858 (2002). Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of [his] freedom of action in any significant way."  ***Miranda***, ***supra*** at 444, 86 S.Ct at 1612, 16 L.Ed.2d at 706. "The ***Miranda*** safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." ***Commonwealth v. Gaul***, 590 Pa. 175, 180, 912 A.2d 252, 255 (2006), ***cert. denied***, 552 U.S. 939, 128 S.Ct. 43, 169 L.Ed.2d 242 (2007).  Thus, "Interrogation occurs where the police should know that their words or actions are reasonably likely to elicit an incriminating response from the suspect." ***Commonwealth v. Ingram***, 814 A.2d 264, 271 (Pa.Super. 2002), ***appeal denied***, 573 Pa. 671, 821 A.2d 586 (2003).  "In evaluating whether ***Miranda*** warnings were necessary, a court must consider the totality of the circumstances . . . ." ***Gaul***, ***supra***.

***Commonwealth v. Gonzalez***, 979 A.2d 879, 888-889 (Pa.Super. 2009), quoting ***Commonwealth v. Williams***, 941 A.2d 14, 30 (Pa.Super. 2008) (***en banc***).

Whether a person is in custody for *Miranda* purposes depends on whether the person is physically denied of [her] freedom of action in any significant way or is placed in a situation in which [she] reasonably believes that [her] freedom of action or movement is restricted by the interrogation. Moreover, the test for custodial interrogation does not depend upon the subjective intent of the law enforcement officer interrogator. Rather, the test focuses on whether the individual being interrogated reasonably believes [her] freedom of action is being restricted.

*Commonwealth v. Clayton Williams*, 539 Pa. 61, 74, 650 A.2d 420, 427 (1994) (internal citations omitted). *See also Commonwealth v. Mannion*, 725 A.2d 196, 202 (Pa.Super. 1999) (*en banc*) (stating whether person is in custody for *Miranda* purposes must be evaluated on case-by-case basis with due regard for facts involved); *Commonwealth v. Peters*, 434 Pa.Super. 268, 642 A.2d 1126, 1130 (1994) (*en banc*), *appeal denied*, 538 Pa. 668, 649 A.2d 670 (1994) (stating: "Among the factors the court utilizes in determining, under the totality of the circumstances, whether the detention became so coercive as to constitute the functional equivalent of a formal arrest are: the basis for the detention; the duration; the location; whether the suspect was transferred against [her] will, how far, and why; whether restraints were used; the show, threat or use of force; and the methods of investigation used to confirm or dispel suspicions"; fact that defendant was focus of investigation is relevant for determination of whether defendant was in "custody" but does not require *per se Miranda* warnings).

*Williams*, 941 A.2d at 30-31 (brackets in original).

When deciding a motion to suppress a confession, the touchstone inquiry is whether the confession was voluntary. Voluntariness is determined from the

totality of the circumstances surrounding the confession. The question of voluntariness is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess. The Commonwealth has the burden of proving by a preponderance of the evidence that the defendant confessed voluntarily.

*Nester*, 709 A.2d at 882 (citations and footnote omitted).

When assessing voluntariness pursuant to the totality of the circumstances, a court should look at the following factors: the duration and means of the interrogation; the physical and psychological state of the accused; the conditions attendant to the detention; the attitude of the interrogator; and any and all other factors that could drain a person's ability to withstand suggestion and coercion.

*Id.*, 709 A.2d at 882 (citations omitted). "The line of distinction between a voluntary and an involuntary confession is that at which governing self-direction is lost and compulsion propels the confession." *Id.* at 884 (citations omitted).

Before the interview began at 10:15 a.m., Rigg signed a "Notification of Non-Arrest" form, acknowledging that he was not under arrest and was free to leave at any time. (Notes of testimony, 4/16/15 at 24-25; Commonwealth's Exhibit 2.) Detective Fick testified that Rigg appeared to understand the form and did not have any questions. (*Id.* at 25.) Rigg asked whether he could record the interview on his cell phone;

Detective Fick did not object but requested that Rigg make him a copy. (***Id.*** at 26.) Rigg agreed. (***Id.***)

The interview took place on the 15th floor. They sat in a small room, approximately 7' by 6', at a round table. (***Id.*** at 42.) The door was closed but not locked. (***Id.*** at 43.) They took a short, 10-minute break from 11:50 a.m. to 12:00 p.m., during which Rigg left the room to use the bathroom. (***Id.*** at 28, 50-51.) Rigg was not accompanied by law enforcement. (***Id.***) Detective Fick asked him to wait in the lobby area when he was done. (***Id.***)

They took a second break at 12:25 p.m., and Detective Fick got Rigg some crackers and water. (***Id.*** at 29.) Rigg remained alone in the interview room during this second break. (***Id.*** at 58.) Up until this point, Rigg had consistently denied knowing anything about J.F.'s injuries. (***Id.*** at 57.) Detective Santoro showed Rigg color photographs of J.F. in a body cast and told him to "take a look at these and really think about it." (***Id.*** at 76.) Detective Santoro told Rigg, "I don't want to hear, 'I didn't do it.'" (***Id.*** at 77.) According to Detective Fick, it was during this second break that they realized Rigg's story "wasn't matching with what the others were obtaining." (***Id.*** at 58.)

When the questioning resumed, Detective Fick told Rigg that "things weren't matching." (***Id.*** at 59.) However, Rigg continued to deny causing the injuries to J.F. (***Id.*** at 59-60.) Detective Santoro testified that, "I pled with him if he knew what happened to this child to tell us so that we could

let the hospital know how the injuries were inflicted." (*Id.* at 77.) Finally, at 12:50 p.m., Rigg confessed and agreed to make a statement. (*Id.* at 60.)

According to Detective Fick's testimony, at first, they had no specific information that would implicate Rigg. (*Id.* at 49-50.) Detective Fick testified that, "And when we met with [Rigg] initially, I was under the impression that we were talking to him and trying to get a timeline. I don't believe that anyone was looking at him at that time like he had any involvement in this." (*Id.* at 41.) It is clear, however, that as the interview progressed, Detectives Fick and Santoro became increasingly aggressive in their questioning of Rigg:

> [Detective Santoro]: "I walked into that room [at Hershey Medical Center]. It broke my heart. We do this for a reason. We spent the weekend in here for a child we never met before. I know you for the last hour. I don't know if you love this child or reject it. You have nothing to do with this child. If you can look at this child and not feel something, I don't know. I think you do. Nobody is going to blow smoke up our asses and tell us a 2 year old did this. It's bullshit. Bullshit. Now's the time for us so we can tell the doctors and maybe save her life. If this child dies and you know what happened, there's gonna [sic] be a big problem. Period. You think because 'I didn't have anything to do with it but I know what happened,' my opinion is if I could drive it home on you, I will. If I could drive it home on you, and you will burn."
>
> Detective Fick then said[,] "if we find out someone lied, they're fucked."

- 10 -

Detective Santoro then said, "I met her five minutes and it breaks my heart. Now tell us what happened. It's bullshit that you don't know. You know what happened."

Detective Fick said, "she was under your care."

Detective Santoro said, "somebody start talking because she's over there running her mouth[,]" referring to J.F.'s mother.[4]

Detective Fick said, "she [J.F.'s mother] already told us something that doesn't match."

Detective Santoro said, "if you did something and it was an accident, on that recording, you need to tell us because if you walk out of here and we call you back in it's not on there that it was an accident. So what happened with the child? Don't tell me a 2 year old did this. Don't tell me you don't know. Again, we have 60 years['] law enforcement and we talk to liars and murderers every day who blow smoke up my ass and spend life in prison. We need the information to know if this child will survive and how things happened so doctors can save her life."

Detective Fick said, "if you made a mistake, tell us so we can help this child. That's what we're all here for no matter what happened."

Detective Santoro said, "I can see it all over your face that you know what happened[,]" after which [Rigg] said, "I don't know. I feel so bad for this kid."

---

[4] In fact, Detective Santoro testified that while J.F.'s mother was in the office, he did not know whether or not she was being interviewed at that time. (Notes of testimony, 4/16/15 at 74.)

Rigg's brief in support of omnibus pre-trial motion, 7/23/15 at 16-17;

Docket #25 (some brackets in original).[5]

> Detective Fick said, . . . "What went wrong?  You can't tell us you don't know.  Here's what happened: you know, or you made a mistake and accidentally hurt this child."
>
> Detective Santoro then said, "or you tried to kill her."
>
> Detective Fick asked, "are you a killer?" which [Rigg] denied.  Detective Fick then said, "scratch that off the table."

*Id.* at 17.

> Detective Santoro then asked, "who hurt this kid? Don't tell me you don't know who hurt this child. You were there.  We talked to people already.  These marks just don't appear like in a horror movie.  This child was injured.  This child was hurt.  The next day, she has marks.  The kids didn't do this.  The other injuries weren't from that night.  There was a full scan of her body.  This child has old injuries, broken bones that are healing, so you need to start running your mouth because if she's saying you're a killer, then I guess we'll believe her.  Is that what you want to do?"

*Id.*

> Detective Santoro said, . . . "Let me take a break and give you about 5 to 10 minutes and when we come back I don't want to hear that we don't know, that I have no idea, that's craziness, that's insanity."

---

[5] From our review of the recordings, these quotations are substantially verbatim.  There is no transcript in the record.  However, while a word or phrase is missing here or there, as a whole, they accurately reflect what was being said.

> Detective Fick then offered to bring [Rigg] another water into the interview room to which [Rigg] responded, "um, sure." Detective Santoro finished with "think about it. Really look at her[,]" referring to the photographs of J.F. in the hospital bed.

*Id.* at 18.

Detectives Fick and Santoro then left Rigg in the interview room alone with the photographs of J.F. Rigg was not told he was free to leave. (*Id.* at 58-59.) They returned approximately ten minutes later, and the questioning resumed. Unfortunately, the third part of the interview, from 12:34 p.m. to 12:50 p.m., is not available.[6] However, Detective Fick testified that, "my report indicates when we pushed approximately 12:34, it was at 12:50 is when he admitted that he caused the injuries." (Notes of testimony, 4/16/15 at 60.) Up until that point, Rigg had consistently denied that he hurt J.F. (*Id.* at 59-60.) Detective Fick testified that they told Rigg that "things were not matching" and that he needed to tell them the truth so they could help J.F. (*Id.* at 60-61.) Although Rigg was told he was free to leave and could end the interview at any time prior to the start of the interview process at 10:15 a.m., it was not repeated until after he confessed. (*Id.* at 46, 57, 59, 64, 71.)

Examining the totality of the circumstances, we agree with the trial court that a reasonable person in Rigg's shoes would not have felt free to

---

[6] Apparently, this portion of the interview was deleted from Rigg's phone. (Notes of testimony, 4/16/15 at 17-18, 33.)

leave, particularly when it became clear to the detectives that Rigg's story was not "matching up." Detective Fick testified that during the first part of the interview, he had no particular reason to believe Rigg was responsible for J.F.'s injuries. (*Id.* at 49.) However, after the second break at 12:25 p.m., it became apparent that Rigg was not telling them the truth. (*Id.* at 57-59.) It was at this point that Rigg became the prime suspect in the investigation. (*Id.* at 58.)

As set forth above, the questioning intensified, with Detective Fick stating, "if we find out someone lied, they're fucked," and Detective Santoro telling Rigg that, "It's bullshit that you don't know." Detective Santoro directed Rigg to look at the photographs of J.F.'s bruised and battered body and "when we come back I don't want to hear that we don't know, that I have no idea, that's craziness, that's insanity." Detective Fick asked Rigg, "Want us to bring you another water back in?" No reasonable person in these circumstances would feel free to get up and leave, notwithstanding the "Notification of Non-Arrest" form that Rigg signed at 10:15 a.m., two hours earlier.

In addition, the detectives' questioning was clearly designed to elicit an incriminating response. Despite Rigg's denials, they repeatedly told him that they did not believe his story, that he knew what really happened, and that if he did not tell them, he "will burn." Detective Santoro suggested that

perhaps Rigg had intentionally tried to kill J.F. This was a custodial interrogation and ***Miranda*** warnings were required.

Rigg's confession was not voluntary, but was the result of hours of intense police interrogation, including the use of threats and psychological coercion. Detective Santoro warned Rigg that, "we talk to liars and murderers every day who blow smoke up my ass and spend life in prison." Detective Santoro told Rigg, "you need to start running your mouth because if she's saying you're a killer, then I guess we'll believe her [(J.F.'s mother)]." They repeatedly told Rigg that unless he told them what happened, J.F. could die. The detectives suggested that the purpose of the "interview" was not to assign blame, but simply to discover the cause of J.F.'s injuries so that information could be passed along to J.F.'s doctors.

In addition, Rigg had a verbal scale IQ score of 79, which is borderline intellectually disabled. (Notes of testimony, 6/29/15 at 32-33.) A verbal IQ of 79 is in the 8th percentile. (***Id.*** at 29.) Rigg was classified as learning disabled and given an Individual Education Plan. (***Id.*** at 7.) Low IQ is a relevant factor in determining the voluntariness of a confession. ***Commonwealth v. Purvis***, 326 A.2d 369 (Pa. 1974). Edward Glassic, Jr., the Exeter Township School District certified school psychologist, testified regarding Rigg's disability:

> So if Cody is being interrogated and he comes
> voluntarily into the police department and they start
> asking him questions. Pretend there is an officer at
> the door. There is an officer over there and an

officer sitting right in front of him. And it would be very difficult. And let's say the interrogation goes on for two hours. Gets very tense. Cursing, yelling, screaming. Things like that. Accusations. Well, if you look at Cody's records, you will find out that he is sociable. Polite. He can navigate pretty well in the social world. So he is not going to -- he may have respect for authority. So he may not leave that room. It may not dawn on him that everything that he says can and probably will be held against him. He might not know the implications of that. It might not ever dawn on him that he can get out of that room when he is feeling the heat. Get out of dodge and go talk to his parents or seek additional help. That may never occur to him. Especially under stressful circumstances.

Notes of testimony, 6/29/15 at 31.

For these reasons, under the totality of the circumstances, we determine that the trial court did not err in finding that the questioning by police evolved into a custodial interrogation that was likely or expected to elicit a confession; and, therefore, *Miranda* warnings were required. Certainly, once it became clear that Rigg's version of events was not consistent with other information and he was the primary focus of the investigation, *Miranda* warnings were required before police could escalate the interrogation by using increasingly aggressive and manipulative tactics. During the second break in questioning, when Rigg was essentially told to stay in the interview room and examine J.F.'s photographs and warned that, "when we come back I don't want to hear that we don't know, that I have no idea," a person in Rigg's situation would reasonably believe that his freedom of movement was being restricted by the interrogation. At that point the

interrogation became the functional equivalent of an arrest. We do not find Rigg's execution of the "Notification of Non-Arrest" form to be dispositive; rather, it is one factor to be considered. Furthermore, Rigg's confession was not the product of a free and unconstrained choice, especially considering his low verbal scale IQ of 79. As such, the trial court did not err in suppressing Rigg's statements to police.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/9/2017